**UNITED STATES of America, Appellee,**

**v.**

**Peter SGRO, Defendant, Appellant.**

**No. 86–1407.**

United States Court of Appeals, First Circuit.

Argued Dec. 5, 1986.

Decided April 17, 1987.

See also, 1st Cir., 766 F.2d 7.

Jamie Ann Sabino with whom Klibaner & Sabino, Cambridge, Mass., and Roger Witkin, Boston, Mass., were on brief, for defendant, appellant.

Peter E. Papps, Asst. U.S. Atty., with whom Richard V. Wiebusch, U.S. Atty., Concord, N.H., was on brief, for appellee.

Before CAMPBELL, Chief Judge, TORRUELLA and SELYA, Circuit Judges.

TORRUELLA, Circuit Judge.

This is the second installment of a matter which has previously been before us in another form. *United States v. Crooks,* 766 F.2d 7 (1st Cir.1985). The appeal presents two issues: (1) whether the Government exercised its peremptory challenges in violation of the rule established in *Batson v. Kentucky,* 476 U.S. ——, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), and (2) whether remarks attributed to the prosecution deprived defendant of a fair trial. We respond in the negative to both questions and thus affirm defendant's conviction.

Defendant was charged on January 6, 1984 in a two count indictment alleging conspiracy to obstruct commerce by extortion in violation of 18 U.S.C. § 1951, and obstruction of commerce by extortion in violation of 18 U.S.C. §§ 1951 and 1952. It was claimed that defendant by the use of threats and violence, and conspiring with two codefendants, induced one Albert Ferguson to cease rendering services as disk jockey to Daisy's Restaurant, forcing him instead to provide his apparently much-sought after services only to the Cafe Mews. The scene of the crime was North Conway, New Hampshire, where both establishments are engaged in interstate commerce.

Defendant was tried before a jury, convicted and sentenced to consecutive two-year terms on each count.

*The challenge to the peremptory challenges*

In *Batson,* the Supreme Court ruled that a defendant in a state criminal trial could establish a *prima facie* case of racial discrimination violative of the Fourteenth Amendment based on the prosecution's use of peremptory challenges to strike members of defendant's race from the jury venire. Defendant seeks to further open the door left ajar in *Batson.*

In the present case defendant, who claims to be an "Italian-American," alleges that the government violated *Batson* because it peremptorily challenged "the only two Italian-surnamed jurors" on the venire,[1] thus attempting on impermissible grounds "to exclude Italian-Americans, a cognizable group in the community of which defendant is a member."

As first line of defense the government raises the non-retroactivity of *Batson.* *Batson* was decided after this case was tried and while this appeal was pending. Although the retroactivity of *Batson* may have been an open question when this appeal was argued, the matter has since been definitively decided by the Supreme Court in *Griffith v. Kentucky,* —— U.S. ——, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987), in which it was ruled that *Batson* was applicable "retroactively to all cases, state or federal, pending on direct review or not yet final, with no exception for cases in which the new rule constitutes a 'clear

---

1. The two names in question are Joan Catano and Marco Fiore. No evidence was presented regarding the ethnicity of these names, at least one of which could very well be Hispanic.

break' with the past." —— U.S. at ——, 107 S.Ct. at 716. This is such a case and thus we are required to apply *Batson* retroactively to this appeal.

■■■ The government fares better on the merits of the *Batson* issue, however. For a defendant to establish a *prima facie* case of purposeful discrimination in the selection of the petit jury, based solely on evidence concerning the prosecutor's exercise of preemptory challenges at the defendant's trial, the defendant first must show that he is a member of a cognizable racial group. *Batson*, 106 S.Ct. at 1722–1723; *Castañeda v. Partida*, 430 U.S. 482, 492, 97 S.Ct. 1272, 1279, 51 L.Ed.2d 498 (1977). Appellant-defendant has failed to meet his burden in this respect. We assume without deciding that the principles of *Batson* would extend to ethnic as well as racial constituencies. On this assumption, the standard that must be met to establish that a group is constitutionally cognizable is no longer subject to question. *See Duren v. Missouri*, 439 U.S. 357, 364, 99 S.Ct. 664, 668, 58 L.Ed.2d 579 (1979); *Barber v. Ponte*, 772 F.2d 982, 997 (1st Cir.1985) (*en banc*). The proponent must prove that (1) the group must be definable and limited by some clearly identifiable factor, (2) a common thread of attitudes, ideas or experiences must run through the group, and (3) there must exist a community of interests among the members, such that the group's interests cannot be adequately represented if the group is excluded from the jury selection process.

■■■ Other than general statements to the effect that "[c]ommon experience dictates that Italian-Americans are a distinctive ethnic group" and, that "[t]he members of this ethnic group certainly have common ideas, attitudes and experience," the record is singularly bare of any *evidence* from which such findings could have been reached by the trial court.

Appellant did not request an evidentiary hearing on the issue of cognizability. Neither did he make an offer of proof as to

facts tending to show *prima facie* the presence of a cognizable group. Furthermore, he offered no evidence showing what surnames are "Italian-American" or demonstrating the relationship between surnames and ethnicity. Appellant's conclusory allegations are insufficient to satisfy the burden of proving cognizability. We will not endorse such a practice. At the very least, a party seeking to invoke *Batson* must sketch out a fact-based *prima facie* showing of cognizability in the *Duren* sense.

Sgro entirely failed to carry even this minimal burden. There was not a scintilla of evidence suggested to, or placed before, the district judge to show that the undefined designation "persons bearing Italian-American surnames," or even the designation "Italian-American" meets the test promulgated by *Duren* and *Barber* to establish a constitutionally cognizable class.[2]

No further inquiry is thus required on this issue.

### The prosecutor's remarks and questions

■■■ Defendant seeks reversal of his conviction because of perceived prosecutorial misconduct related to allegedly inflammatory interrogation during trial. To grant such a remedy we must conclude that the misconduct, assuming it is such in this case, was likely to have affected the trial's outcome, or that the sanction requested is needed to deter future prosecutorial misconduct. *United States v. Capone*, 683 F.2d 582, 585–586 (1st Cir.1982). To determine whether either of these two conclusions are warranted, we must examine the content of the improper remarks, the severity of the misconduct, whether it was deliberate or accidental, whether curative instructions were given and their likely effect, and the strength of the evidence against defendants. *Id.*

Two separate incidents are involved. In the first, during the interrogation of Deborah Kneeland, the government was refreshing her memory with prior grand jury testimony. The following colloquy ensued:

---

**2.** The unsatisfactory vagueness of the record is highlighted by the fact that there is nothing which in any way indicates that the appellant-defendant's name, Sgro, hardly one in common usage, is "Italian-American."

Q—[Mr. Miller]—That was the same big guys that were standing around the table; is that correct?

A—[Mrs. Kneeland]—Yes.

Q—Standing around the table while Peter was seated; isn't that correct?

A—Possibly. I don't know.

Q—How would you characterize these big men?

Mr. Witkin—Objection, your Honor please, to characterization.

The Court—Well, why don't you be a little more specific. You're allowed to lead.

Q—Would it be unfair to characterize them as a kind of musclemen?

Mr. Witkin—Objection.

The Court went further, however, and ruled the prosecutor in contempt.[3] The Court denied a motion for mistrial, but gave a cautionary instruction to the jury directing it to disregard the term "musclemen."[4]

This ruling has as a background a motion *in limine* filed by defense counsel prior to trial in which the defendant sought a prohibition against attempts by the prosecutor to imply that defendant was connected to organized crime. At the *Crooks* trial, involving appellant's co-defendants, the prosecutor had used words such as "musclemen" and "enforcers." In this case the district court ruled in favor of defendant's motion *in limine* and admonished the prosecutor from using such terms directly, or indirectly through the witnesses.

■ Although the district court's ruling is not at issue, our decision in *Crooks* does not hold, as appellant implies in his brief, that the use of the term "musclemen" is *per se* improper. *Crooks*, 766 F.2d at 12. Thus, although the district court is perfectly correct in requiring compliance by the prosecutor with its rulings, a violation of such a ruling by the prosecutor, although

appropriately the basis for sanctions individually against such prosecutor, does not necessarily dictate reversal or the ordering of a new trial if such conduct does not independently affect the integrity of the judicial proceeding vis-a-vis defendant's rights.

■ In this case, the isolated use of the term "musclemen", on one occasion during the middle of a trial that commenced on December 9, 1985 and terminated on December 18, 1985, can hardly be called a momentous happening. The term "musclemen" has no racial or ethnic implication on its face but rather relates to a method of operation relevant to the crimes charged, and was fairly used in the light of the proof presented.[5] It is no more improper to use this terminology when dealing with a case of extortion than to use "robber" or "gunman" when dealing with the crime of armed robbery.

Furthermore, the circumstances under which the term was used, although clearly in violation of the district court's *in limine* ruling, do not appear to be the product of a deliberate attempt to cause prejudice to defendant, but rather the result of the examination of a witness who was less than cooperative. Additionally, the fact that immediate curative instructions were given by the trial court, instructions which none of the parties deemed inadequate on their face, appear to us to have cured any possible prejudice to defendant, even assuming the remark was *per se* improper. Last, but not least, this statement, when considered within the totality of the evidence presented against the appellant, had an insignificant impact in deciding the outcome of his case before the jury.

■ We will presently outline this evidence in considering the second incident as to which appellant claims prosecutorial mis-

---

3. The record does not indicate if a hearing was held or the prosecutor punished as a result of this ruling.

4. The instruction is not reproduced in the appendices by either party to this appeal. We therefore assume that its content was appropriate.

5. *Webster's Third New International Dictionary*, p. 1489: "a man hired (as by a gangster) to enforce compliance by strong—arm methods: GOON, ENFORCER."

conduct: the interrogation of Olga Hall, a defense character witness. On cross-examination, she stated that she had learned of the charges against the defendant in August, 1985, a statement she reaffirmed on redirect examination. On recross examination, she stated that she had learned about the charges from the defendant in person. The government then asked whether she was aware that the F.B.I. was looking for the defendant. Counsel for defendant objected. Again, the Court gave a cautionary instruction unobjected to by either party.

Appellant claims that this interrogation was improper because it raised the "specter of flight and consciousness of guilt without any foundation or real evidence as to flight." The district court had previously asked the prosecution whether there would be evidence of flight and was told that no such evidence would be introduced. The defense moved for a mistrial when the question was asked, but instead the court gave a limiting instruction.

The prosecution could have, had it chosen to, presented direct evidence of flight as proof of consciousness of guilt. *See United States v. Ritch,* 583 F.2d 1179, 1181 (1st Cir.), *cert. denied,* 439 U.S. 970, 99 S.Ct. 463, 58 L.Ed.2d 430 (1978). The government did not, however. And, assuming the validity of the limiting instruction, the issue remains whether in the context of the trial, the totality of the evidence, the particular circumstance of this incident, and the trial court's instruction, the defendant's rights were prejudiced to such an extent as to have changed the outcome of the trial. Again the answer to all these questions is in the negative.

The evidence against appellant was overwhelming, making this "incident" as unimportant in the final outcome as was the other claim of prosecutorial misconduct.

Several witnesses testified that they saw and heard Sgro threatening Albert Ferguson to get him to stop providing disk jockey services to Daisy's and provide them only to Cafe Mews. Ferguson testified that Sgro threatened to "smash the lounge" (Daisy's), destroy Ferguson's equipment and hurt him if he did not do as told. His wife, Kristin, corroborated these threats. The most damning evidence was testimony about a meeting between Ferguson, his wife, the owner of Cafe Mews, Sgro, and four men Sgro claimed to have paid $20,000 to carry out the earlier threats.

During that meeting, which was observed by one of Ferguson's assistants and a waitress from Cafe Mews, one of Sgro's men threw a glass at Kristin Ferguson, cutting her and breaking a tooth. A doctor testified that her injuries were consistent with her testimony. After she was brought to the hospital, Sgro told Ferguson his wife was lucky that was all she got. Sgro then engaged in a dialogue with another of his men. Sgro asked: "If I tell you to break his arm, will you break his arm? Will you break his fingers? Or if I told you to shoot him, would you shoot him." The man kept responding, "Yes, I would." In response to these and other threats made during the over two hour meeting, Ferguson stopped working at Daisy's. In the light of this evidence, claims that the alleged prosecutorial misconduct had any effect on the outcome of Sgro's conviction are spurious.

In view of the above, the judgment of the district court is *affirmed.*