**UNITED STATES of America,**

v.

**Mario BIAGGI and Meade Esposito, Defendants.**

**No. Cr 87–151 (JBW).**

United States District Court, E.D. New York.

Nov. 6, 1987.

Andrew J. Maloney, U.S. Atty. by Edward A. McDonald and Leonard Michaels, Sp. Attys., Dept. of Justice, Brooklyn, N.Y., for U.S.

Barry I. Slotnick, Richard A. Medina, New York City, for M. Biaggi.

Edward Brodsky, Thomas H. Sear, New York City, for M. Esposito.

## MEMORANDUM AND ORDER ON PEREMPTORY CHALLENGES

WEINSTEIN, Chief Judge:

Defendants were convicted of either giving or receiving a thing of value. 18 U.S.C. § 201(f), (g). Both were also found guilty of violations of the Travel Act. 18 U.S.C. § 1952. In addition, defendant Mario Biaggi was convicted of obstruction of justice. 18 U.S.C. § 1503. Each defendant moved to set aside the verdicts on the ground that the prosecution had used its peremptory challenges discriminatorily to exclude Italian–Americans from the jury. As indicated in detail below, although the defendants were able to make out a prima facie showing of unconstitutional discrimination against Italian–Americans, the government proved that it did not purposefully exercise its challenges in a discriminatory manner.

### I. FACTS

Defendants are well-known political figures. Mario Biaggi has been a member of the United States House of Representatives since 1968, and is now the senior Congressman from New York City. Meade Esposito served eight terms as chairman of the Democratic Party in Brooklyn, until early 1984, and was one of the most powerful political leaders in New York State.

They were indicted after Mr. Biaggi exerted his influence to assist Coastal Dry Dock, a Brooklyn company and one of Mr. Esposito's insurance firm's largest clients, and Mr. Esposito agreed to pay for two vacations taken by Mr. Biaggi and a friend at the Bonaventure Resort and Spa in Ft. Lauderdale, Florida. The jury acquitted the defendants of bribery and corruption charges but convicted them of the offenses described above.

Both defendants are of Italian descent. At the voir dire, the prosecutor used his first five peremptory challenges to exclude veniremembers Joseph Angerome, Frank Lauvicano, Andrew Baccarella, Patricia Randazzo, and Louis Devito. After the fifth challenge, defense counsel suggested that the government's challenges had been

used in "a consistent pattern of striking jurors whose last names end in a vowel, apparently of Italian descent." The prosecution used its next and last peremptory challenge to strike Lawrence Kern. The prosecution also struck two alternate jurors, one of whom was Angela DiSanto. On the first day of trial, when juror no. 6 failed to appear, one alternate filled seat six and a new alternate was chosen. The government exercised its single challenge to exclude Dorothy Delbano. Exercise and discussion of the challenges were conducted at sidebar in order to insulate the venire from potential taint.

At the close of voir dire, the defense made an application to dismiss the jurors and draw a new panel. In order to permit careful consideration of the issues involved, the court directed that a formal motion be made on written papers. By letter, the government presented an explanation for the exclusion of Louis Devito, a member of the Department of Sanitation, to which the defendants may both have had close ties. Because the defense sought time to inquire into the backgrounds of both the impaneled jurors and the excused jurors, and in anticipation of receiving the requisite full briefs from the parties, the court postponed decision until after trial.

Upon receiving the verdict, the court formally discharged the jury. Then it asked each to say, if the juror did not mind answering, whether he or she had any "Italian parentage or other Italian relationship." One of the jurors, Theresa Cataldo, had Italian parents and grandparents. Another, Catherine Lapreta, had an Italian father. Juror William McNichol had an Italian wife. Three other jurors had Italian brothers- or sisters-in-law, and a seventh juror had Italian stepchildren. Five jurors said they had no Italian relatives. Three of the jurors, Cataldo, Lapreta, and Franco, had names ending in vowels, although juror Franco said that his ancestry was Dominican and Spanish. Two of the jurors, both of whose names did not end in vowels, were black. After interviewing the jurors, the court renewed its direction that the parties submit comprehensive written memoranda and affidavits on the motion and provide witnesses, if they wished, at an evidentiary hearing.

All parties submitted briefs on the issues. The government also submitted an affidavit setting forth the lead prosecutor's state of mind with respect to each of his peremptory challenges. The justifications relied upon by the government are discussed in Part IV, *infra.*

At the evidentiary hearing the two prosecutors who had participated in the voir dire were sworn. In response to defense questions, they explained in detail their reasons for employing each peremptory challenge. In essence they affirmed the declarations in the affidavit, with some elaboration. To this they added the important role of Italian–Americans in the prosecutor's office and in their personal lives.

Although this adversarial method of inquiry "do[es] in fact take more time, and [is] more cumbersome," the court pursued it because it "helps us get at the truth." *United States v. Thompson,* 827 F.2d 1254, 1259 (9th Cir.1987). Defense counsel's active participation in the hearing is helpful to "point out to the district judge where the government's stated reason [for a peremptory challenge] may indicate bad faith," *id.* at 1260, and to "preserve for the record, and possible appeal, crucial facts bearing on the judge's decision," *id.* at 1261. Defense counsel's vigorous and dogged questioning of the prosecutors served both these purposes, at no great administrative cost.

## II. DEFENDANTS' EQUAL PROTECTION CLAIMS

Although prosecutors have traditionally been able to employ peremptory challenges without stating their reasons, the Supreme Court has ruled that such challenges may not be used in furtherance of racial discrimination. In *Swain v. Alabama,* 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), the Court held that the Fourteenth Amendment's equal protection clause prohibits prosecutors from exercising peremptory challenges "in case after case" to exclude Black veniremembers on racial

grounds "with the result that no Negroes ever serve on petit juries." *Id.* at 223, 85 S.Ct. at 837. Two Terms ago, in *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), a case involving a black defendant, the Court reduced the defendant's evidentiary burden by holding that the defendant could make a prima facie showing of such discrimination against the defendant's "cognizable racial group" based purely on evidence concerning the defendant's own trial, *Id.,* 106 S.Ct. at 1723–24.

◼ In order to make a prima facie showing of discriminatory peremptory challenges under the equal protection clause, a defendant must show that members of his or her cognizable racial group were excluded from the jury, and that the facts raise an inference of purposeful racial discrimination.

[T]he defendant first must show that he is a member of a cognizable racial group, *Castaneda v. Partida,* [430 U.S. 482, 494, 97 S.Ct. 1272, 1275, 51 L.Ed.2d 498 (1977)], and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race. Second, the defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits "those to discriminate who are of a mind to discriminate." *Avery v. Georgia,* [345 U.S. 559, 562, 73 S.Ct. 891, 893, 97 L.Ed. 1244 (1953)]. Finally, the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race.

*Batson,* 106 S.Ct. at 1723.

Under this three-part test and on the basis of the "facts and other relevant circumstances," *Batson,* 106 S.Ct. at 1723, the defendants have established a prima facie case of discrimination in violation of the equal protection clause. Defendants' equal protection claims are applicable to the federal government through the Fifth Amendment due process clause.

Although *Batson* involved a constitutional challenge based on the equal protection clause of the fourteenth amendment, it seems clear that the holding and rationale of that case should also be used to determine similar fifth amendment claims that are raised by defendants who have been tried in federal court. *See, e.g., Bolling v. Sharpe,* 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954). *United States v. Dennis,* 804 F.2d 1208, 1209 n. 21 (11th Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 1973, 95 L.Ed.2d 814 (1987). *See also Johnson v. Robison,* 415 U.S. 361, 364 n. 4, 94 S.Ct. 1160, 1164 n. 4, 39 L.Ed.2d 389 (1974) ("Thus, if a classification would be invalid under the Equal Protection Clause of the Fourteenth Amendment, it is also inconsistent with the due process requirement of the Fifth Amendment.").

### A. *"Cognizable Racial Group"*

Each defendant was born in the United States to parents who had immigrated from Italy. Defendants characterize themselves, and others living in this country who share some ancestral connection with Italy, as "Italian–Americans." In particular, defendants assert that they and other Italian–Americans are, among other methods, identifiable by their last names, which commonly end in vowels.

◼ In order to satisfy the first prong of the *Batson* three-part test, it must be shown that Italian–Americans constitute a "cognizable racial group." *Batson,* 106 S.Ct. at 1723. The standard for determining cognizability for equal protection objections to peremptory challenges during jury selection under *Batson* is the one set out in *Castaneda v. Partida,* 430 U.S. 482, 494, 97 S.Ct. 1272, 1274, 51 L.Ed.2d 498 (1977), as is clear from the *Batson* Court's direct citation to *Castaneda. See Batson,* 106 S.Ct. at 1723. This standard defines as cognizable any group that is "a recognizable, distinct class, singled out for different treatment under the laws, as written or as applied." *Castaneda,* 430 U.S. at 494, 97 S.Ct. at 1274. *See also United States v. Dennis,* 804 F.2d 1208, 1210 (11th Cir.

1986), *cert. denied*, —— U.S. ——, 107 S.Ct. 1973, 95 L.Ed.2d 814 (1987), (applying *Castaneda* test to *Batson* analysis).

The government urges that, instead of following *Castaneda*, the court should adopt the reasoning of the First Circuit in *United States v. Sgro*, 816 F.2d 30 (1st Cir.1987), which found the evidence insufficient to establish that Italian–Americans are a "cognizable racial group" under *Batson*. There the First Circuit chose to borrow the cognizability standard developed for the Sixth Amendment requirement that the jury venire represent a fair cross-section of the population. *See Sgro*, 816 F.2d at 33 (employing the characteristics outlined in *Duren v. Missouri*, 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979), and *Barber v. Ponte*, 772 F.2d 982, 997 (1st Cir.1985) (en banc)). The *Sgro* court's borrowing act is initially suspect because the Supreme Court in *Batson* quite clearly commanded that *Castaneda* govern its own use of the term "cognizable racial group." *See Batson*, 106 S.Ct. at 1723.

■ Furthermore, there is an important difference between the meaning of cognizability in these two different contexts. Discrimination against a group in the cross-section of the venire, in violation of the Sixth Amendment, may be demonstrated by mere statistical underrepresentation of that group. *See Duren*, 439 U.S. at 368 n. 26, 99 S.Ct. at 670 n. 26. Discrimination in the use of peremptory challenges in violation of the equal protection clause, by contrast, necessitates a showing of the "essential element" of "discriminatory purpose." *Id.; see Batson*, 106 S.Ct. at 1723–24. Because discrimination in the venire under the Sixth Amendment may be statistical, the definition of a "cognizable group" must be narrowly drawn lest any group imaginable by defense counsel be found numerically underrepresented. *See Barber*, 772 F.2d at 999 (en banc) (warning that "blue-collar workers, yuppies, Rotarians, Eagle Scouts, and an endless variety of other classifications" could receive protection).

Because the guarantee against discrimination through peremptory challenges requires a showing of purpose, "cognizable racial groups" may be defined less rigidly, for it is precisely the evidence of intentional exclusion of the group that helps to identify the group. The First Circuit itself made this distinction clear:

That is not to say, however, that if a classification were *specifically* and *systematically excluded* from jury duty the same standard would be used as here, where defendant simply relies on a statistical disparity in the venires to challenge its constitutionality [under the fair cross-section rule]. If certain people are specifically and systematically excluded from jury duty, then the jury-administrating authority would have created its own group.

*Barber*, 772 F.2d at 999–1000 (en banc) (emphasis in original).

Even though the appropriate standard to be applied here is that adopted in *Castaneda*, *Sgro's* criteria are useful. In *Sgro*, the First Circuit opined that cognizable groups (1) are definable and limited by some clearly identifiable factor, (2) share a common set of attitudes, ideas or experiences, and (3) share a community of interests, such that the group's interests cannot be adequately represented if the group is excluded from the jury selection process. *See Sgro*, 816 F.2d at 33.

■ Italian–Americans in this district satisfy the *Sgro* criteria. The court takes judicial notice of Italian–Americans' cognizability and of their commonly identifiable names. Judicial notice has often been employed to recognize groups as constitutionally cognizable. *See, e.g., Barber, supra*, 772 F.2d at 987, *rev'd*, 772 F.2d 997 (1st Cir.1985) (en banc); *LaRoche v. Perrin*, 718 F.2d 500, 504 (1st Cir.1983); *United States v. Butera*, 420 F.2d 564, 570 (1st Cir.1970).

Defendant Biaggi through his counsel has also made the court aware of the opinion of linguistics experts that the struck jurors' last names are clearly Italian–American. These observable, distinguishable names constitute a clearly identifiable factor separating Italian-Americans from most other ethnic groups. These names emanate from Italian ancestors who immi-

grated to this country and who constitute a discrete resource from which Italian–American heritage has been passed down.

Italian–Americans share a common experience and background in their links to Italian families, Italian culture, and Italian group loyalties, and often share the same religious and culinary practices. The court takes judicial notice that Italians have been subject to stereotyping, invidious ethnic humor and discrimination. *See Snell v. Suffolk County,* 611 F.Supp. 521 (E.D.N.Y. 1985), *aff'd,* 782 F.2d 1094 (2nd Cir.1986). *See also Regents of the University of California v. Bakke,* 438 U.S. 265, 292 & n. 32, 98 S.Ct. 2733, 2749 & n. 32, 57 L.Ed.2d 750 (1978) (Opinion of the Court per Powell, J.) (" '... Italians ... continue to be excluded from executive, middle-management, and other job levels because of discrimination based upon their religion and/or national origin.' 41 C.F.R. § 60–50.1(b) (1977)."); *Weber v. Kaiser Aluminum & Chemical Corp.,* 563 F.2d 216, 235 (5th Cir.1977) (Wisdom, J., dissenting) (noting that "Americans of Irish, Italian, Jewish [and] German extraction" have been subjected to "undoubted past societal discrimination").

Like any group recently emigrated from a cohesive nation, Italian–Americans share numerous common "threads" of attitudes, ideas and experiences, often including largely intertwined family relations in the country of origin. Finally, Italian–Americans have a community of interest: they generally share certain cherished values received through generations of Italian civilization and religion, including values relevant to moral culpability. Across the board exclusion of this group could not but impair the representation of these interests in juries.

The decision in *Sgro* is not to the contrary. There, the court simply thought the evidence insufficient for a finding that Italian–Americans are a cognizable group. *See United States v. Sgro,* 816 F.2d 30, 33 (1st Cir.1987). Here, the court finds, on the basis of all the "facts and any other relevant circumstances," *Batson,* 106 S.Ct. at 1723, and taking judicial notice of such other facts as necessary and appropriate, that there is a sufficient showing to categorize Italian–Americans as cognizable.

Alternatively, Italian–Americans are a "cognizable racial group" under the less restrictive *Castaneda* standard more properly applied to the present *Batson* inquiry into purposeful discrimination by peremptory challenges. Italian–Americans are "recognizable" and "distinct," and appear to have been "singled out for different treatment under the laws, as written or applied." *Castaneda v. Partida,* 430 U.S. 482, 494, 97 S.Ct. 1272, 1280, 51 L.Ed.2d 498 (1977). Italian–Americans share a common ancestry in Italy, a common cultural and religious heritage there and here, and they often still share a common language. They are identifiable, in part, by their characteristic last names. The court takes judicial notice that Italian–Americans are considered in this district to be a recognizable and distinct ethnic group, commonly identified by their last names and by their neighborhoods. These qualities are sufficient to render Italian–Americans no less cognizable than the other groups who have already been recognized as cognizable for equal protection purposes. *See, e.g., Castaneda,* 430 U.S. at 495, 97 S.Ct. at 1280 (Mexican-Americans are cognizable because "Spanish surnames are just as easily identifiable as race"); *Hernandez v. Texas,* 347 U.S. 475, 479, 74 S.Ct. 667, 671, 98 L.Ed. 866 (1954) (Mexican-Americans are a distinct class because the "attitude of community" was to distinguish between them and "whites"); *Roman v. Abrams,* 822 F.2d 214 (2nd Cir.1987) (white persons constitute a cognizable group); *United States v. Chalan,* 812 F.2d 1302, 1313–14 (10th Cir.1987) (summarily finding American Indians to be a cognizable group under *Batson* ).

Italian–Americans are also shielded by the equal protection clause's prohibition against discrimination on the basis of ancestry. *See Saint Francis College v. Al-Khazraji,* — U.S. —, — & n. 5, 107 S.Ct. 2022, 2028 & n. 5, 95 L.Ed.2d 582 (1987); *Hernandez, supra,* 347 U.S. at 479, 74 S.Ct. at 671; *Oyama v. California,* 332 U.S. 633, 646, 68 S.Ct. 269, 275, 92 L.Ed. 249 (1948); *Hirabayashi v. United States,* 320 U.S. 81, 100, 63 S.Ct. 1375, 1385, 87

L.Ed. 1774 (1943). In *Hernandez,* the Court held unconstitutional the ancestry-based exclusion from juries of Mexican–Americans, and rejected the notion that only two "racial" groups, white and black, are deserving of equal protection. Rather, "[t]he exclusion of otherwise eligible persons from jury service solely because of their ancestry or national origin is discrimination prohibited by the Fourteenth Amendment." *Hernandez,* 347 U.S. at 479, 74 S.Ct. at 671. Italian–Americans' shared ancestry is easily visible in their Italian surnames, just as Mexican ancestry has been found readily apparent from surnames alone. *See Castaneda,* 430 U.S. at 495, 97 S.Ct. at 1280.

■ Finally, the definition of "cognizable racial groups" under *Batson* cannot reasonably be restricted to exclude ethnic minorities. It is now recognized that the legislation enacted shortly after the Civil War to prohibit race discrimination, including the enabling legislation of the equal protection clause of the Fourteenth Amendment, was intended to protect a variety of groups not now labeled "races." After its decision in *Batson,* the Supreme Court decided that this enabling legislation, codified at 42 U.S.C. §§ 1981 and 1982, protects a variety of ethnic minorities from "race" discrimination. *See Saint Francis College v. Al-Khazraji,* — U.S. —, 107 S.Ct. 2022, 95 L.Ed.2d 582 (1987) (Arabs are protected under § 1981); *Shaare Tefila Congregation v. Cobb,* — U.S. —, 107 S.Ct. 2019, 95 L.Ed.2d 594 (1987) (Jews are protected under § 1982). These decisions established that although Jews and Arabs are not now recognized as racial groups, the question is whether the enacting Congress in 1870 intended to protect them from discrimination. Relying on both dictionary definitions of "race" from the period and the legislative history of the statutes, the Court concluded that "Jews and Arabs were among the peoples then considered to be distinct races and hence within the protection of the statute." *Shaare Tefila,* 107 S.Ct. at 2022.

Reviewing the scholarly definitions of race from the "middle years of the 19th century," the Court found a virtual consensus that race at that time meant ethnic or ancestral affiliation. *See St. Francis,* 107 S.Ct. at 2026–27. For example, "[t]he 1863 version of the New American Cyclopedia ... identified numerous other groups as constituting races, including Swedes, Norwegians, Germans, Greeks, Finns, *Italians,* Spanish, Mongolians, Russians, and the like." *Id.* at 2027 (citations omitted) (emphasis supplied). The Court's research disclosed that only in this century have "races" been divided physiognomically into three classifications, Caucasian, Mongoloid, and Negroid; even this taxonomy is merely a "popular understanding" thought to be "arbitrary and of little use" by many "modern biologists and anthropologists." *Id.* at 2026 & n. 4.

Legislative history of the post-Civil War statutes provides corroborative support for the view that "races" then included "immigrant groups" coming from each foreign nation. *St. Francis,* 107 S.Ct. at 2028. The Court summarized:

> [W]e have little trouble in concluding that Congress intended to protect from discrimination identifiable classes of persons who are subject to intentional discrimination solely because of their ancestry or ethnic characteristics.

*Id.* It can therefore be confidently concluded that the Court in *Batson* meant "cognizable racial groups" to include a variety of ethnic and ancestral groups subject to intentional discrimination, including Italian–Americans.

This process of defining racial groups evokes abhorrent images of policies pursued by the Nazis and other enemies of humanity. Yet, as is true in other areas of our law, we must somehow identify those who need defense. We must take care to apply these definitions in the interest of protection, lest they be wielded by the apologists of intolerance and racism. Ultimately, should there be any question remaining whether Italian–Americans fall on one side or the other of the elusive line encircling the set of protected "cognizable racial groups," courts must err on the side of cognizability. The Supreme Court has instructed that "[i]n light of the great potential for harm latent in an unconstitutional

jury-selection system, and the strong interest of the criminal defendant in avoiding that harm, any doubt should be resolved in favor of giving the opportunity for challenging the jury to too many defendants, rather than giving it to too few." *Peters v. Kiff,* 407 U.S. 493, 505, 92 S.Ct. 2163, 2169, 33 L.Ed.2d 83 (1972).

### B. *Inference of Purposeful Discrimination*

The second prong of the *Batson* test is not really a test at all, but provides that "the defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits 'those to discriminate who are of a mind to discriminate.'" *Batson,* 106 S.Ct. at 1723 (citation omitted).

The third prong requires the defendant to "show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race." *Id.* The Court expressed its "confidence that trial judges, experienced in supervising voir dire, will be able to decide if the circumstances concerning the prosecutor's use of peremptory challenges" constitute grounds for such an inference, based on the trial court's consideration of "all relevant circumstances." *Id.*

■ The prosecutor used his first five peremptory challenges to strike jurors with apparent Italian surnames. After the defense made its application on *Batson* grounds, the prosecutor used his last peremptory challenge to strike an evident non-Italian. Later, the prosecutor used two of his challenges of alternates to exclude two Italian-named individuals. This conduct constitutes a "pattern" of strikes sufficient to raise an inference that the prosecutor sought to exclude venirepersons on the basis of their Italian–American affiliation. *See Batson,* 106 S.Ct. at 1723. Accordingly, the defense made out a prima facie showing of discrimination.

The fact that the prosecutor did not use his sixth challenge against an Italian surname is of little moment. Cases finding no prima facie showing on the ground that the prosecutor failed to use all of his strikes against members of the group are inapposite because none involve a prosecutor who used strikes against the group until the moment the practice was flagged by the defense. *See, e.g., United States v. Porter,* 831 F.2d 760 (8th Cir.1987) (finding no prima facie case where prosecutor struck one of two blacks and accepted the other); *United States v. Montgomery,* 819 F.2d 847 (8th Cir.1987) (finding no prima facie case where prosecutor used two of six strikes against blacks, and accepted a jury panel with two blacks remaining on it); *United States v. Dennis,* 804 F.2d 1208 (11th Cir. 1986), *cert. denied,* — U.S. —, 107 S.Ct. 1973, 95 L.Ed.2d 814 (1987) (finding no prima facie case where prosecutor used three of six strikes against blacks, and accepted a jury panel with two blacks remaining on it); *Fleming v. Kemp,* 637 F.Supp. 1547 (M.D.Ga.1986) (finding no prima facie case where prosecutor used eight of ten strikes against blacks, and accepted a jury panel with two blacks remaining on it); *cf. Clark v. City of Bridgeport,* 645 F.Supp. 890 (D.Conn.1986) (finding prima facie case where city attorney used all his available challenges to strike all blacks from the jury). Furthermore, the prosecutor here did use additional challenges to strike two Italian–Americans from the alternate jury venire, even after the defense's motion was first made. These strikes provide some additional evidence of a "pattern" of discriminatory challenges.

### III. DEFENDANTS' SIXTH AMENDMENT CLAIMS

Soon after the Supreme Court decided *Batson,* the Second Circuit adhered to its own view, first announced in *McCray v. Abrams,* 750 F.2d 1113 (2nd Cir.1984), *vacated and remanded,* — U.S. —, 106 S.Ct. 3289, 92 L.Ed.2d 705 (1986), *appeal dismissed per stipulation,* No. 84–2026 (2nd Cir. Oct. 23, 1986), that the Sixth Amendment similarly "does protect [the defendant] against the state's discriminatory

use of peremptory challenges in such a way as to eliminate even the possibility that the petit jury could reflect a cross section of the community." *Roman v. Abrams,* 822 F.2d 214, 224–25 (2d Cir.1987) (reconsidering *McCray* in light of *Batson* and concluding that *McCray*'s Sixth Amendment analysis remains "the current law of this Circuit").

■ The Sixth Amendment analysis of peremptory challenges required by the Second Circuit does not differ from the equal protection analysis described above. The prima facie showing "adopted by the Court [in *Batson* ] for evaluation of the defendant's equal protection claim was essentially the same [as the one the Second Circuit] had set out in *McCray* for evaluation of such a claim under the Sixth Amendment." *Roman,* 822 F.2d at 225. *McCray* required the defendant to show that:

> in his case, (1) the group alleged to be excluded is a cognizable group in the community, and (2) there is substantial likelihood that the challenges leading to this exclusion have been made on the basis of the individual venirepersons' group affiliation rather than because of any indication of a possible inability to decide the case on the basis of the evidence presented.

*McCray,* 750 F.2d at 1131. Thus, the prima facie findings set forth above, that Italian–Americans are for these purposes a cognizable group who appear to have been excluded from the jury, and that the evidence is sufficient to raise the inference that the exclusion was based on the struck venirepersons' Italian–American affiliation, are also sufficient to make out a prima facie case under the Sixth Amendment.

## IV. JUSTIFICATION FOR PROSECUTOR'S CHALLENGES

■■ The successful presentation of a prima facie case does not end the matter. In response to the prima facie case, the government must justify its use of peremptory challenges. "Once the defendant makes a prima facie showing, the burden shifts to the State to come forward with a neutral explanation for challenging black jurors." *Batson,* 106 S.Ct. at 1723. For each challenge found by the court to have been prima facie discriminatory, the prosecutor must "articulate a neutral explanation related to the particular case to be tried." *Id.* Each explanation must be a " 'clear and reasonably specific' explanation of [the prosecutor's] 'legitimate reasons' for exercising the challenges," *id.* 106 S.Ct. at 1723 n. 20 (quoting *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 258, 101 S.Ct. 1089, 1096, 67 L.Ed.2d 207 (1981)). In rebutting the prima facie case of discrimination, the prosecutor may not merely assert his "good faith" or absence of discriminatory motive in making the challenges, nor may he rebut based on his "assumption—or his intuitive judgment —that [the jurors] would be partial to the defendant because of their shared race." *Id.* 106 S.Ct. at 1723 (citations omitted). Although the prosecutor must therefore produce substantive and race-neutral reasons for his challenges, the Court "emphasize[d] that the prosecutor's explanation need not rise to the level justifying exercise of a challenge for cause." *Id.* 106 S.Ct. at 1723.

■ The prosecutor's explanations, together with the other relevant facts regarding the use of challenges, are then to be considered by the trial court in order "to determine if the defendant has established purposeful discrimination." *Id.* 106 S.Ct. at 1724 (footnote omitted). This determination is a " 'finding of fact' entitled to appropriate deference by a reviewing court. Since the trial judge's findings in the context under consideration here largely will turn on evaluation of credibility, a reviewing court should give those findings great deference." *Id.* 106 S.Ct. at 1724 n. 21 (citations omitted).

■ After careful consideration of the prosecution's affidavit, its answers under oath to defense counsel's questioning at the hearing on October 20, and the relevant facts surrounding the jury selection, the court finds the prosecution's explanations credible, neutral and legitimate. Normally preliminary matters must be proved by a preponderance of the evidence. *See Lego*

*v. Twomey,* 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972). In this case the court is satisfied beyond a reasonable doubt that the prosecutors did not engage in purposeful discrimination.

Each of the prosecutor's challenges was exercised for permissible reasons. Joseph Angerome was struck on several grounds: he became unusually angry at the court clerk's mispronunciation of his name, *see* McDonald Affidavit at 9; he had voted for Mr. Biaggi in an election, *see id.;* and he had been employed in the Post Office, which might have led him to sympathize with Mr. Biaggi, himself a onetime postal worker and public advocate of civil servants' causes, *see id.* at 9–10. In addition, the prosecution's most serious concern in jury selection was avoiding jurors who thought the vacation gifts involved would be de minimus, *see* Transcript of Hearing on Italian–Americans Motion at 49–54 (testimony of Mr. Michaels) (hereinafter "Hearings"), and the prosecution believed that employees of the Post Office often take Christmas gifts of cash and would more likely condone such gifts, *see* McDonald Aff. at 10.

Frank Lauvicano was excluded because he wore a disrespectful T-shirt, depicting horses and advertising the Saratoga race track. On the basis of the T-shirt and Mr. Lauvicano's demeanor, the prosecution considered Mr. Lauvicano to be arrogant, insufficiently serious about jury duty in federal court, and even disdainful of the process. *See* McDonald Aff. at 10; Hearings at 26–29. The lead prosecutor could not recall having seen a veniremember wearing a racetrack T-shirt in any previous jury selection. *See* Hearings at 29 (testimony of Mr. McDonald).

The government removed Andrew Baccarella because his wife worked for a printing company on Long Island, and could quite possibly have been influenced by Mr. Esposito's close connections to that industry in that locale. *See* McDonald Aff. at 10–11.

Patricia Randazzo was excluded in part based on her hostile reaction to the prosecution's request that the court ask her certain extra questions at voir dire. The prosecutor, at sidebar, requested that the court inquire whether she was related to the proprietors of Randazzo's Restaurant, whose owners were longtime friends of Mr. Esposito. After the question (to which she answered "no"), Mrs. Randazzo appeared to stare angrily at the prosecutor, perhaps in embarrassment over having been one of the few veniremembers singled out for a specific question. *See* McDonald Aff. at 12–13; Hearings at 33–35. In addition, Mrs. Randazzo's husband was a retired police officer who had been in the police department about the same time as Mr. Biaggi, and Mr. Biaggi's wide reknown and extraordinary prestige as a police officer, and his past executive office in the Patrolmen's Benevolent Association, suggested to the prosecution that Mrs. Randazzo would sympathize with the defendant. *See* McDonald Aff. at 12–13; Hearings at 35–36.

The strike against Louis Devito was justified by Mr. Devito's employ as a foreman in the New York City Department of Sanitation: both defendants appeared to have ties to the Department and to its union. Mr. Esposito was close friends with officials of both the Department and the union, and his insurance and printing firms had done work for the union. Mr. Biaggi's law firm had represented the union during the past few years. *See* McDonald Aff. at 11–12; letter from Mr. McDonald to the court, dated August 27, 1987, and attached as exhibit to McDonald Aff.; Hearings at 32–33.

The government's reasons for striking the two alternate prospective jurors were also legitimate. Angela DiSanto was removed because she was active in organizations in which Mr. Biaggi was probably a leading officer or by which he had probably been honored. *See* McDonald Aff. at 13; Hearings at 36–38. The fact that these organizations primarily promoted Italian–American interests does not contaminate the strike, because the prosecution made clear that it was striking based on the common allegiance to the organizations, whatever type they might be, and not

based on common ethnic heritage. *See* Hearings at 47–48. "If they had been members of a Sherlock Holmes Organization or something ... and the defendants had also been members or at least honored by or affiliated with these organizations I would have wanted to exclude her on that basis as well." Hearings at 47–48 (testimony of Mr. McDonald).

Finally, Dorothy Delbano was removed because of her flippant attitude and discourteous responses to questions. The government felt she seemed annoyed and uninterested in the jury process, and would not make an earnest juror. *See* McDonald Aff. at 13; Hearings at 39–40.

These strikes must all be seen in the context of a federal voir dire. The attorneys do not generally ask questions, but submit questions to the judge, who then asks the questions of the veniremembers. In contrast to the state court voir dire available in *Batson*, the parties here glean much less detailed information about each veniremember. They therefore are forced to rely more on inference and assumption than would counsel with full data on the venire.

Strikes should also be analyzed by comparing them with those who were not struck. The government accepted a jury panel including Ms. Lapreta, Ms. Cataldo, and Mr. Franco, all of whom have potentially Italian-sounding names. The prosecutor testified that he also believed the juror named Cutter to have had some Italian background, based on Cutter's facial features and home neighborhood, and the possibility that his last name had originally been Italian. *See* Hearings at 26–27. The alternates accepted by the government included Louis Ruggiero.

The government's explanations were not mere assertions of good faith. They were neutral, specific and reasonable explanations substantiating legitimate exclusions of each of the veniremembers removed. *See Batson*, 106 S.Ct. at 1723–24. Although the explanations do not rise to the level that would justify a removal for cause, the Constitution does not require peremptory challenges to be so well founded. *See id.* 106 S.Ct. at 1723. As long as peremptory challenges remain a feature of our jury selection system, they will necessarily contain a component that is somewhat unconstrained and colored by intuition. Only by eliminating peremptory challenges altogether can every challenge be made accountable to the trial judge; that choice, desirable or not, has not yet been made by the Supreme Court. *See id.* 106 S.Ct. at 1726–29 (Marshall, J., concurring).

The suggestion of purposeful discrimination is further rebutted by the actual composition of the resulting petit jury. The jury contained at least two members, Cataldo and Lapreta, who were of Italian descent, and seven of the twelve jurors had some close family relation of Italian descent. It constituted an excellent cross-section of the Eastern District of New York by ethnic background, race, sex, education, age, experience and geography. In particular, in Kings County, New York, where the case was tried, approximately 15% of the population reports itself as of Italian ancestry. *See 1980 Census of Population, Census Tracts: New York, NY–NJ SMSA* (U.S. Department of Commerce, Bureau of the Census, 1983), Table P–8, p. P–558. The figure is similar for the New York Metropolitan Area, *see id.* (calculated as the New York part of the NY–NJ SMSA), and slightly higher for Nassau County, New York, *see Nassau County Data Book* (Nassau County Planning Commission, 1985), Table 53, p. 273 (reporting 1980 U.S. Census data). The jury chosen here had at least two of twelve members with Italian ancestry, for a minimum representation of 16.67%. These data show the jury's close proportionate representation of the available venire pool, bolstering the conclusion that the prosecution did not strike an inordinate number of Italian–Americans in an effort to discriminate against them.

Beyond serving as corroborative evidence, the prosecution's failure to distort the actual representation of Italian–Americans on the jury is itself a shield against the defendants' claims. Such failure, at least in this Circuit, essentially precludes the defendant from prevailing on a claim

that peremptory challenges have been used discriminatorily. In a case in which it held that the equal protection right announced in *Batson* is also guaranteed by the Sixth Amendment, the Second Circuit wrote that

> if the prosecutor has succeeded in excluding a cognizable group from the jury by the discriminatory use of his peremptory challenges, ... the defendant's constitutional right has been impaired. In such a case, a defendant is entitled to have his conviction set aside and to receive a new trial.
>
> Where, however, the actions of the prosecutor have *not* succeeded in excluding the targeted group and have not reduced the petit jury representatives of that group *dramatically below* the group's percentage in the venire or in the population of the community, it is difficult to see that the defendant has indeed been denied the possibility that the Sixth Amendment guaranteed him.

*Roman v. Abrams*, 822 F.2d 214, 229 (2nd Cir.1987) (emphasis supplied). Absent a shortfall in the actual representation of a cognizable group, the defendant cannot obtain a new trial.

Defendants urge that *Roman* requires the trial court to act "during the jury selection process" to remedy discrimination. But *Roman* makes clear that such early action by the trial judge is only available when the prosecutor "has succeeded" in excluding the group; when the prosecutor has not "succeeded in ... dramatically" reducing the group's representation on the jury, no remedy is required. *Id.* at 229. In the present case the defense did not submit adequate motion papers until after trial.

The jury actually empaneled had every reason to sympathize with the defendants on the basis of their good works for a wide variety of ethnic groups. Evidence presented at trial showed that both defendants were active in ethnic clubs and associations; that both devoted long periods of public service to the gamut of ethnic groups among their constituencies; and that through direct and indirect assistance, the defendants were constantly furthering the special interests of Italians, Irish, Hispanics, Blacks, Jews, and other ethnic groups. Mr. Esposito is a life member of the NAACP. He has received awards from, among other organizations, the Italian Business and Professional Men's Associations, the United Jewish Appeal, the Federation of Jewish Philanthropies, the Anti–Defamation League, B'nai Brith, the International League for the Repatriation of Russian Jews, the Chinese Community of New York, and the March of Dimes, and he was named man of the year of the Hispanic Organizations. Congressman Biaggi is widely known for his efforts on behalf of the Italians, the Irish in Northern Ireland, Soviet Jewry, and the victims of apartheid. Each juror could not but feel moved by one or more of the defendants' many generosities on behalf of a group with whom the juror was associated.

## V. CONCLUSION

The Supreme Court has held that the equal protection clause, applicable to federal prosecutions through the Fifth Amendment, prohibits purposeful discrimination against a defendant's cognizable racial group in the exercise of peremptory challenges. *See Batson v. Kentucky, supra,* 476 U.S. 79, 106 S.Ct. 1712, 1723–24, 90 L.Ed.2d 69 (1986). The Sixth Amendment approach of this Circuit rests on the provision that "an accused shall enjoy the right to ... trial by an impartial jury ..."; as interpreted, this clause implies a cross-section of the community "from which distinctive groups" are not "systematically excluded." *McCray v. Abrams, supra,* 750 F.2d 1113, 1116 (2nd Cir.1984). *See also Roman v. Abrams*, 822 F.2d 214, 225 (2nd Cir.1987) (reaffirming after *Batson* that *McCray* remains "the current law of this Circuit").

The tests for a prima facie case of discrimination under *Batson* and *McCray* are nearly identical, and both the Supreme Court and the Second Circuit permit proof of a violation to be limited to the single case in issue. Here the defendants made a prima facie case under both standards, but upon consideration of the prosecution's reasons for its challenges and of the relevant

surrounding circumstances, the jury selection complied with both the equal protection and the Sixth Amendment clauses. There was no purposeful discrimination in the exercise of the challenges and the challenges did not distort the cross section of the community. The jury was fairly chosen and fairly representative.

The motion to set aside the verdict is DENIED.

So ordered.