UNITED STATES of America

v.

**Mario BIAGGI, Stanley Simon, Peter Neglia, John Mariotta, Bernard Ehrlich & Richard Biaggi.**

**No. SSSS 87 Cr. 265 (CBM).**

United States District Court,
S.D. New York.

Nov. 22, 1988.

Rudolph W. Giuliani, U.S. Atty., New York City by Michele Hirshman, Asst. U.S. Atty., for U.S.

LaRossa, Mitchell & Ross, New York City by Karen Silverman, for defendant Mario Biaggi.

Skadden, Arps, Slate, Meagher & Flom, New York City by Jeffrey Glekel, for defendant John Mariotta.

Dominick F. Amorosa, New York City, for defendant Richard Biaggi.

## OPINION

MOTLEY, District Judge.

Defendants John Mariotta, Richard Biaggi, and Mario Biaggi have asserted that the Government improperly used its peremptory challenges to strike Italians and Puerto Ricans from the petit jury in this case. This court held a hearing on this motion pursuant to the Supreme Court's opinion in *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). In *Batson*, the Supreme Court held that the Government violates the Equal Protection Clause when a prosecutor uses her peremptory challenges to strike members of the defendant's race from the petit jury in a criminal case. The defense has the burden of establishing a *prima facie* case of discrimination under a three part test:

1. the defendant must first show that he is a member of a cognizable racial group and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race;

2. the defendant may rely on the fact that peremptory challenges are subject to discriminatory use;

3. the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used his peremptory challenges to exclude persons from the jury on the basis of race. *Batson* at 96, 106 S.Ct. at 1722.

Once the *prima facie* case is established, the burden shifts to the Government to come forward with a "neutral explanation related to the particular case to be tried" for challenging those jurors of the defendant's race. *Id.* at 98, 106 S.Ct. at 1723. While the prosecutor cannot merely assert her "good faith" in exercising the peremptory challenge, she need not offer a justifying explanation that rises to the level of a proper challenge for cause. *Id.* at 97, 106 S.Ct. at 1723.

In the Second Circuit, a prosecutor's discriminatory use of peremptory challenges also violates a defendant's Sixth Amendment right to an impartial jury. *Roman v. Abrams*, 822 F.2d 214, 224–25 (2d Cir.1987). However, since the Second Circuit has said that *Batson*'s Equal Protection analysis is essentially the same as its Sixth Amendment one, *Roman* at 225, we need not worry about the application of two different standards under two different constitutional provisions.

In *Batson*, the Supreme Court expressly declined "to formulate particular procedures to be followed upon a defendant's timely objection to a prosecutor's [peremptory] challenges." *Batson* 476 U.S. at 99, 106 S.Ct. at 1724. While not explicitly setting forth particular procedures to be followed, the Second Circuit has suggested that a *Batson* claim requires an adversarial hearing at which the defense should have the opportunity to cross-examine prosecutors concerning their motives for the peremptory challenges in question. *See United States v. Biaggi*, 853 F.2d 89, 96 (2d Cir.1988).

Accordingly, this court held an adversarial hearing to determine the merits of defendants' *Batson* claims. Prosecutor Mary Shannon testified for many hours concerning the Government's use of its peremptory challenges and turned over to the defense a large assortment of handwritten lists and notes made by her at the time of jury selection. In addition, the Government turned over the original jury questionnaires which formed the basis for the voir dire. In sum, the documentary evidence produced by the Government was exhaustive and relates to those jurors challenged by the prosecutors as well as those not challenged. All these written materials have become part of the record available for review by this court. We are satisfied that the Government has supplied every piece of paper in its possession which might possibly illuminate the prosecutors' reasons

for their exercise of the peremptory challenges in question. When added to the hours of cross-examination which Ms. Shannon endured as the Government's only witness, this court is satisfied that defendants' had more than an adequate opportunity to examine the prosecutors' motives and make their case.

*Discussion*

There is no doubt that both Hispanics, *Castaneda v. Partida*, 430 U.S. 482, 495, 97 S.Ct. 1272, 1280, 51 L.Ed.2d 498, and Italians, *United States v. Biaggi*, 673 F.Supp. 96 (E.D.N.Y.1987), *aff'd.*, 853 F.2d 89 (2d Cir.1988), should be considered cognizable racial groups for *Batson* purposes. It is also undisputed that Mariotta's heritage is Hispanic and that Mario and Richard Biaggi are of Italian ancestry.

At the hearing, the evidence showed that the Government used its peremptory challenges to strike four of the five persons on the venire with Hispanic surnames: Efraim Acosta, Ramon Surita, Eddie Perez, and Sandra Bracero. In addition, the Government struck two of the four alternate jurors with Hispanic surnames: Brunilda Rivera and Miguel Morales. Of the six members of the venire with Italian surnames, the Government used its peremptory challenges to strike five: Mary Mancini, Theresa Vomero, Charlotte Marzani, Joseph Siragusa, and Salvatore DeNoia. The one alternate juror with an Italian surname, Joseph Sbarra, was not challenged.

The manner in which the peremptory challenges were used by the Government constitutes a "pattern" of strikes sufficient to raise an inference that prosecutors sought to remove Hispanics and Italians from the jury because of their race. *See Biaggi* 673 F.Supp. at 103. Accordingly, defendants have made out a *prima facie* showing of discrimination for *Batson* purposes. The burden now shifts to the prosecution to come up with neutral explanations for each peremptory strike.

As to those jurors with Spanish surnames, Shannon testified that Efraim Acosta was struck because she overheard him telling other prospective jurors how to lie at the voir dire in order to avoid jury service. In addition, Acosta was employed by the Sanitation Department police force. Given Mario Biaggi's well known service as a police officer, the prosecutor's were hesitant to let Acosta on the jury since they believed that someone so closely associated with law enforcement could be overly sympathetic to a former law enforcement officer. Ramon Surita was struck because he testified that his wife was expecting a baby in May and would be upset if he missed the birth. The Government was concerned that his family situation would cause Surita to be inattentive to the proceedings. Eddie Perez was struck because he did not appear to speak and understand English well and because prosecutors did not believe that he was intelligent enough to understand the complex RICO charges in this case. In addition, the Government was concerned that his stated support for minority programs would incline him too heavily in favor of defendant Mariotta, whose participation in the Government's 8(a) program was at the heart of this case. Sandra Bracero was struck because she worked for the New York City Department of Housing Preservation and Development and the Government expected the Commissioner of that department—Anthony Glidman—to testify at trial. The prosecutors felt that such a connection between witness and juror might have biased Bracero's judgment of her superior's testimony in ways they could not predict. They had similar concerns about Bracero's perception of the many other New York City employees expected to testify at the trial. Alternate juror Brunilda Rivera was struck beacuse she worked for an 8(a) contractor at the time of the voir dire and had a husband who was a defense lawyer and a brother who was a corrections officer. Her connection with the 8(a) program, law enforcement, and the defense function suggested to prosecutors that Rivera might be biased in favor of defendants Mario Biaggi and Mariotta. Finally, alternate juror Miguel Morales was struck because she was a part-time prison missionary and the Government expected a good deal of testimony at the trial related to Mariotta's numerous contributions to religious organizations (this in relation to the charges of tax

evasion). In striking Morales, Shannon testified that the prosecutors were concerned that Morales' religious affiliations and convictions would make her too sympathetic towards a defendant who had contributed so much money to religious causes.

As to those jurors with Italian surnames, Shannon testified that Mary Mancini was struck because she was the sole support of her family and complained of the severe financial hardship she would suffer as the result of a long trial. The Government was afraid that Mancini's concern over the financial strain placed on her by the trial would make her an inattentive and preoccupied juror. In addition, Mancini lived in Yonkers—part of Mario Biaggi's congressional district—and testified that she was aware of his works as a congressman. This led the Government to question Mancini's impartiality. Theresa Vomera was struck because she knew of Wedtech although she could not remember the details of what she had heard. The Government was afraid that as the trial progressed she might begin to remember things about the company that could affect her deliberations as a juror. In addition, Vomero lived in Manhattan's "Little Italy" near a restaurant where important meetings involved in the case took place. The prosecutors did not want a juror familiar with the restaurant or the surrounding area such that she might be tempted to go off and investigate the case on her own. Shannon also testified that since Vomero's daughter was a court reporter the Government was concerned that Vomero might speak with her about the case. Finally, Vomero did not appear that intelligent to prosecutors and they had doubts about her ability to understand the complex RICO charges in this case. Prosecutors struck Charlotte Marzani because she harbored bitter feelings towards the Government as a result of her husband's prosecution for making false statements to Congress during the Eastland Committee's investigation of communist activity in the 1950's. Joseph Siragusa was challenged because prosecutors were uncertain about his sobriety and because of his stated belief that public officials like Mario Biaggi should not be charged with crimes. Finally, Salvatore DeNoia was struck because he testified that he lived in Mario Biaggi's congressional district, knew of his good works, and felt very uncomfortable sitting on a case which could decide the congressman's fate. Under these circumstances, the Government was justifiably concerned about DeNoia's impartiality.

This court finds Shannon's testimony credible and sees nothing in the documents submitted into evidence that would substantially contradict her statements. Reviewing the testimony elicited at the hearing and all the documentary evidence, we are satisfied that the Government has met its burden of providing neutral explanations for its use of the peremptory strikes in question. Under the standards elaborated by the Supreme Court in *Batson*, we hold that the Biaggi prosecutors did not improperly use their peremptory challenges to strike Italians and Hispanics from the jury and deny defendants' motion for a new trial.