**UNITED STATES of America, Appellee,**

v.

**Mario BIAGGI and Meade Esposito,
Defendants–Appellants.**

**Nos. 892, 918, Dockets 87–1484, 87–1501.**

United States Court of Appeals,
Second Circuit.

Argued March 30, 1988.

Decided Aug. 1, 1988.

Edward A. McDonald, U.S. Dept. of Justice, Brooklyn, N.Y. (Andrew J. Maloney,

U.S. Atty., E.D.N.Y., Leonard Michaels, Sp. Atty., Brooklyn, N.Y., on the brief), for appellee.

John L. Pollok, New York City (Mark A. Summers, Charles L. Weintraub, Susan C. Wolfe, Mark Baker, Todtman, Hoffman, Epstein, Young, Goldstein, Tunick & Pollok, P.C., New York City, on the brief), for defendant-appellant Mario Biaggi.

Edward Brodsky, New York City (Thomas H. Sear, Robert J.A. Zito, Maria L. Ciampi, Spengler Carlson Gubar Brodsky & Frischling, New York City, on the brief), for defendant-appellant Meade Esposito.

Charles Tiefer, Deputy General Counsel to the Clerk of the House of Representatives, Washington, D.C. (Steven R. Ross, General Counsel to the Clerk, Janina Jaruzelski, Asst. Counsel to the Clerk, Washington, D.C., on the brief), for the Speaker and Bipartisan Leadership Group of the U.S. House of Representatives as amici curiae.

Before TIMBERS, KEARSE, and FRIEDMAN,* Circuit Judges.

KEARSE, Circuit Judge:

Defendants Mario Biaggi and Meade Esposito appeal from judgments of conviction entered after a jury trial in the United States District Court for the Eastern District of New York before Jack B. Weinstein, then-*Chief Judge.* Biaggi was convicted on one count of accepting gratuities for· official acts, in violation of 18 U.S.C. § 201(g) (1982) (current version at 18 U.S. C. § 201(c)(1)(B) (Supp. IV 1986)); one count of use of interstate facilities with intent to carry on an unlawful activity, in violation of 18 U.S.C. § 1952 (1982) (the "Travel Act") (since amended by Pub.L. No. 99–570, 100 Stat. 3207–35 (1986)); and one count of obstruction of justice, in violation of 18 U.S.C. § 1503 (1982). Esposito was convicted on one count of giving gratuities, in violation of 18 U.S.C. § 201(f) (1982) (current version at 18 U.S.C. § 201(c)(1)(A) (Supp. IV 1986)); and one count of aiding and abetting Biaggi's viola-

tion of the Travel Act, 18 U.S.C. §§ 1952 and 2 (1982). Biaggi was sentenced to concurrent prison terms of 2–½ years on the obstruction of justice count and a year and a day on the gratuity and Travel Act counts, and was required to pay fines totaling $500,000. Esposito was sentenced to two years' probation, with 500 hours of community service, and was ordered to pay fines totaling $500,000. On appeal, defendants contend that there was insufficient probable cause for the electronic surveillance of Esposito, which led to much of the evidence against the defendants; that the government improperly excluded Italian–Americans from the jury; that Biaggi's acts were not "official act[s]" within the meaning of § 201; that the Travel Act convictions should be overturned on statutory and constitutional grounds; and that the evidence was insufficient to support Biaggi's conviction of obstruction of justice. They also challenge certain of the court's evidentiary rulings. For the reasons below, we reject all of defendants' contentions and affirm the judgments of conviction.

## I. BACKGROUND

Biaggi is a 10–term congressman from New York's 19th Congressional District, which includes parts of Bronx and Westchester Counties. Esposito, former chairman of the executive committee of the Kings County, New York Democratic Committee, was, during the relevant period, a principal in an insurance brokerage firm, Serres, Visone and Rice, Inc. ("SVR"), and a director or affiliate of a printing company, Beaumont Offset Corporation ("Beaumont"). Biaggi and Esposito were indicted in a seven-count indictment focusing on Biaggi's efforts in 1984–1986 on behalf of Coastal Dry Dock and Repair Corporation ("Coastal"), a major client of SVR, and on Esposito's arrangement of payments of expenses for vacations in 1984–1986 for Biaggi and Biaggi's friend. The indictment charged, *inter alia,* that defendants con-

---

* Honorable Daniel M. Friedman of the United States Court of Appeals for the Federal Circuit, sitting by designation.

spired to arrange these vacations in furtherance of a fraud on the United States (count 1); that the vacations constituted bribes demanded by Biaggi and paid by Esposito (counts 2 and 3); that the vacations constituted unlawful gratuities paid by Esposito and received by Biaggi in return for official acts performed by Biaggi (counts 4 and 5); that Biaggi's use of interstate facilities in furtherance of his receipt of the bribes or gratuities violated the Travel Act and that Esposito's funding arrangements aided and abetted that violation (count 6); and that after being questioned by agents of the Federal Bureau of Investigation ("FBI") with regard to two of his vacation trips, Biaggi sought to obstruct the grand jury investigation into these matters (count 7). Both defendants were acquitted on counts 1, 2, and 3. Biaggi was convicted on counts 5, 6, and 7; Esposito was convicted on counts 4 and 6. The evidence at trial, taken in the light most favorable to the government, revealed the following events.

A. *Biaggi's Actions on Behalf of Coastal; the Vacations*

Coastal, whose operations were located in the Brooklyn Navy Yard ("Yard") owned by New York City (the "City"), was in the business of repairing and refurbishing vessels of the United States Navy and other departments of the federal government. During the pertinent period, Coastal was SVR's second or third largest client, usually paying SVR more than $200,000 per year in insurance commissions. In general, the more work Coastal had, the larger its insurance premiums and thus the higher the commissions paid to SVR.

In the early 1980s, Coastal began to experience financial difficulties resulting largely from high fixed costs. It paid substantial rent to the Brooklyn Navy Yard Development Corporation ("BNYDC"), a not-for-profit corporation chartered by the City to run the Yard. Coastal also was required to purchase its electricity, steam, and water from BNYDC at rates higher than those it would have been charged had it purchased directly from the utility companies. In 1983, Coastal's utility rates

rose, it lost three bids on Navy contracts, and important rent credits expired. Beginning in March of that year, Esposito met with the chairman of BNYDC several times and with the City's deputy mayor to express concern about Coastal's situation; by September 1983, Coastal was a half-million dollars behind in its payments to BNYDC, and the BNYDC chairman threatened to complain to the Navy.

In March 1984, Esposito provided Biaggi with a round-trip airline ticket and a four-day vacation at a villa owned by Beaumont on the island of St. Maarten. Also present on the trip were Esposito and Esposito's partners in SVR and Beaumont. On May 9, 1984, Coastal's executive vice-president Vincent Montanti wrote Biaggi, urging him to assist Coastal in its dispute with BNYDC.

Shortly thereafter, Biaggi called Deputy Mayor Kenneth Lipper to express concern about Coastal's difficulties. In addition, in June 1984, Biaggi wrote Mayor Edward Koch a letter, on House of Representatives ("House") stationery, "on behalf of Coastal," urging the City "to work out some accomodations [*sic*]" with regard to Coastal's dispute with BNYDC. Actions by Biaggi's staff on behalf of Coastal were supervised by his congressional administrative assistant.

Biaggi wrote Mayor Koch again in September 1984, this time on the stationery of the House Committee on Merchant Marine and Fisheries. He noted that high utility costs were causing Coastal to lose Navy contracts and stated that he was "eager to be of any assistance in dealing with the Navy." He also suggested, as he had been asked to do by Coastal, that "my presence or the presence of a member of my staff during meetings between the City and Navy might be helpful in demonstrating Congressional interest."

Despite these efforts, Coastal's problems persisted. In October 1984, SVR had to lend Coastal $110,000 to pay overdue insurance premiums.

In mid–1984, Barbara Barlow, Biaggi's friend, had expressed a wish that she and

Biaggi spend a Christmas holiday vacation at the Bonaventure Spa, a health resort near Fort Lauderdale, Florida. The couple planned to stay at the apartment of another friend of Biaggi, and Barlow informed Biaggi that they would need a sponsor to enable them to use the spa's facilities. Biaggi arranged through Esposito to have sponsorship provided by James LaRossa, an attorney who represented Esposito and Beaumont. Biaggi and Barlow participated in the spa's programs, she from December 22, 1984 through January 2, 1985, and he from December 27, 1984 through January 2. Their spa bill totaled $3,228, which was charged to the LaRossa account. LaRossa's law firm paid the bill and was reimbursed by Beaumont. Biaggi's air fare to Florida was paid by the House Committee on Aging.

In July 1985, Deputy Mayor Alair Townsend, Lipper's successor, warned Coastal that she would "shut off" its lights if it did not begin to pay its rent and utility arrears to BNYDC. A few days later, Biaggi called her to express concern about Coastal's situation. Biaggi called Townsend again in September 1985 to repeat his concerns and to urge the City to help Coastal.

While Coastal's difficulties with BNYDC continued through late 1985, a new problem arose. The FBI began investigating the company, causing the Navy to scrutinize claims for compensation more closely and to disallow many such claims. This led to a cash flow problem which in turn made Coastal even less competitive for new Navy contracts. In November 1985, these hardships forced Coastal to cancel substantial amounts of insurance previously purchased through SVR.

On the day Coastal canceled those policies, Esposito, who sought to help Coastal by "working all angles," met with Biaggi and Coastal's Vincent Montanti. Within days, Biaggi sought to assist Coastal with the Navy. He called Alphonse D'Amato, United States Senator from New York, told him that Coastal was being treated unfairly, and asked him to meet with Coastal officials.

On December 2, 1985, Biaggi met with Esposito and Coastal's chairman Charles Montanti. The next day, he attended a meeting at Senator D'Amato's office with the Senator and Vincent Montanti, during which the Senator attempted to call Secretary of the Navy John Lehman. In the following weeks, Biaggi had many conversations with Senator D'Amato, in which he encouraged the Senator to help lobby Deputy Mayor Townsend and asked the Senator about any progress with Secretary Lehman.

Throughout 1985, Barbara Barlow had pressed Biaggi for a repeat of their previous year's winter vacation at the Bonaventure Spa. Biaggi asked Esposito to make the arrangements. On December 17, he telephoned Esposito, providing him with Barlow's name and indicating that she would be at the spa from December 22, 1985, through January 3, 1986, and that Biaggi would arrive on December 27. Immediately after the vacation details were dealt with, Esposito asked, "What else is doin'?" and Biaggi said, "By the way, we've been doin' wonders for Montanti." Biaggi reported that, "on the city side, we've been workin' very hard with them and on the ... federal side, uh ... we've been getting them money." He said, "I've been bird-dogging it right along." Esposito replied, "Okay. That's all I want to know."

Esposito immediately made arrangements with LaRossa for Biaggi and Barlow to stay at the spa and for the expense to be passed on to Beaumont. Esposito then telephoned Charles Montanti and assured him, "Mario's doin' his best." Later that day, Biaggi made additional calls to both Senator D'Amato and Deputy Mayor Townsend about Coastal.

On December 19, 1985, Esposito informed Biaggi that the spa arrangements were set, saying, "I got it all confirmed for you.... Relax." (As in 1984, Biaggi's air fare was to be paid by the House Committee on Aging.) On December 20, Esposito spoke with his SVR partner Joseph Martuscello and told him that Biaggi was going to be a guest at the spa, saying, "hey, that's

good money invested." Martuscello said, "That's good"; Esposito replied, "Yeah, I did it last year too."

After Biaggi returned from this second Florida trip, he continued his efforts on behalf of Coastal. He told Esposito he planned to introduce a bill in Congress to spend $800 million on smaller craft, "stuff [Coastal] can handle." He also met with Senator D'Amato and Charles Montanti to prepare the Senator for a meeting with the Secretary of the Navy. He promised to, and did, call the Commandant of the Coast Guard in an attempt to get more work for Coastal. Biaggi continued his efforts until, in May 1986, Coastal went bankrupt.

### B. *The Federal Investigation*

In October 1985, the federal government had begun an investigation of Esposito unrelated to the matters involving Coastal. In the course of this investigation, it obtained authorization to conduct electronic surveillance of Esposito's home and the offices of Beaumont and SVR. During the surveillance, the agents overheard conversations concerning Biaggi's efforts on behalf of Coastal and the vacations provided him by Esposito and his business partners.

On June 2, 1986, FBI agents visited Biaggi and questioned him about his relationship with Esposito and his actions on behalf of Coastal. Minutes after the FBI interview concluded, Biaggi telephoned Esposito. As set forth in greater detail in Part II.E. below, Biaggi informed Esposito that he had just been questioned by the FBI and prompted Esposito to take the positions, *inter alia,* that Esposito had arranged the vacations because he was concerned for Biaggi's health, not because Biaggi was a member of Congress; and that Esposito's first approach to Biaggi with respect to Coastal had occurred only four or five months earlier. Biaggi also stated that, since he had told the FBI agents only about the two trips to Florida, Esposito should not mention the trip to St. Maarten.

### C. *The Verdicts*

The jury acquitted Biaggi and Esposito of the charges that they had conspired to defraud the United States in violation of 18 U.S.C. § 371 (1982), and that they had, respectively, solicited and paid bribes in violation of 18 U.S.C. §§ 201(c) and (b) (1982) (current versions at 18 U.S.C. §§ 201(b)(2) and (b)(1) (Supp. IV 1986)). It convicted Biaggi of accepting gratuities in return for performing official acts, in violation of 18 U.S.C. § 201(g) (1982), of traveling in or using facilities in interstate commerce with the intent to carry out unlawful acts, in violation of 18 U.S.C. § 1952 (1982), and of obstructing justice, in violation of 18 U.S.C. § 1503. It convicted Esposito of paying gratuities to Biaggi in exchange for his official acts, in violation of 18 U.S.C. § 201(f) (1982), and of aiding and abetting Biaggi's Travel Act violation, in violation of 18 U.S.C. §§ 1952 and 2. Defendants were sentenced as indicated above.

## II. DISCUSSION

On appeal, each defendant mounts a variety of challenges to his conviction. Esposito contends that there was insufficient probable cause to justify electronic surveillance of his home and offices and that the information thereby seized should have been suppressed. Biaggi contends that the evidence was insufficient to support his conviction for obstruction of justice. Both defendants, in addition to making certain evidentiary arguments, contend that the government improperly exercised its peremptory challenges to exclude jurors of Italian descent; that Biaggi's intercessions on behalf of Coastal were not "official act[s]" within the meaning of § 201; that the solicitation or receipt of unlawful gratuities is not a proper predicate for a charge of violation of the Travel Act; and that the court should have dismissed the Travel Act count as violative of the Speech or Debate Clause of Article I of the Constitution. We have considered all of defendants' arguments on these appeals and have found in them no basis for reversal.

### A. *Probable Cause for Electronic Surveillance*

■ Much of the government's evidence in the present case was obtained through

electronic surveillance of the home of Esposito and the offices of SVR and Beaumont pursuant to a series of court orders commencing in October 1985, pursuant to 18 U.S.C. § 2518 (1982 & Supp. II 1984) (amended by Pub.L. No. 99–508, 100 Stat. 1851–53, 1856, 1857 (1986)). Prior to trial, Esposito moved unsuccessfully to suppress the information derived from the surveillances on the ground that there was insufficient probable cause for the issuance of the first such order. This contention, renewed here, lacks merit and does not require extended discussion.

To the extent pertinent here, § 2518 allowed a federal court to authorize interception of oral or wire communications if it determined, on the basis of the facts submitted by the applicant, that there was probable cause to believe (a) that an individual was committing, had committed, or was about to commit an offense enumerated in 18 U.S.C. § 2516 (1982 & Supp. II 1984) (amended by Pub.L. No. 99–508, 100 Stat. 1851, 1855 (1986) and Pub.L. No. 99–570, 100 Stat. 3207–35 (1986)), (b) that particular communications concerning that offense would be obtained through such interception, and (c) that the facilities to be surveilled were being used or were about to be used in connection with the commission of such an offense. 18 U.S.C. §§ 2518(3)(a), (b), and (d). The standard of probable cause applicable to § 2518 is "the same as the standard for a regular search warrant," *United States v. Fury*, 554 F.2d 522, 530 (2d Cir.), *cert. denied*, 433 U.S. 910, 97 S.Ct. 2978, 53 L.Ed.2d 1095 (1977), and a reviewing court will defer to the issuing court's determination that there was probable cause "as long as there existed a substantial basis for a magistrate or judge to conclude that a search would uncover evidence of wrong-doing," *United States v. Nersesian*, 824 F.2d 1294, 1306 (2d Cir.), *cert. denied*, — U.S. ——, 108 S.Ct. 357, 98 L.Ed.2d 382 (1987). There was no lack of probable cause in the present case.

The original surveillance order was entered on the basis of lengthy and detailed affidavits of an FBI agent setting forth, *inter alia*, information obtained through physical surveillances of certain individuals by law enforcement agents and information provided by a number of confidential informants whose reliability had been proven over a span of 2–15 years. The details set forth in the affidavits, which remain under seal, furnished a substantial basis for believing that the individuals identified were using or were about to use the targeted premises for the commission of acts in violation of the racketeering statute, 18 U.S.C. § 1963 (1982), which is one of the offenses enumerated in § 2516. The facts that the anticipated offenses were unrelated to the subject matter of the present prosecution and that Biaggi was not mentioned in the application does not impair the conclusion that the information presented in the application provided probable cause for the issuance of the surveillance authorization. The motion to suppress was properly denied.

### B. *The Peremptory Challenges*

■ Defendants contend that they are entitled to a new trial because the government purposely used its peremptory challenges to exclude Italian–Americans from the jury, in violation of defendants' rights under the Equal Protection Clause, *see Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), and the Sixth Amendment, *see Roman v. Abrams*, 822 F.2d 214, 224–25 (2d Cir.1987). We reject this contention.

During the voir dire, defendants pointed out to the court that the government had used its first five peremptory challenges to exclude members of the venire whose last names ended in vowels. They contended that this evinced the deliberate exclusion of Italian–Americans from the jury. Thereafter, the government also peremptorily challenged two alternate jurors whose last names ended in vowels. At the close of the voir dire, defendants moved to have the jurors dismissed and to select a jury from a new panel. In order to permit full briefing of the matter without delaying the trial—for which a jury had been selected that did include Italian–Americans—the court post-

poned consideration of the matter until the trial had been concluded.

After trial, defendants renewed their motion and requested a new trial. The government submitted an affidavit setting forth the reasons of the lead prosecutor for the government's challenges. Both prosecutors who had participated in the voir dire testified at an evidentiary hearing and were subject to what the district court characterized as "vigorous and dogged" cross-examination by defense counsel.

In an opinion reported at 673 F.Supp. 96 (1987), the court denied defendants' motion. The court noted that defendants had made out a prima facie case of impermissibly discriminatory use of the government's peremptories. Thus, it observed that Americans of Italian descent share a common experience and culture, often share the same religious and culinary practices, often have commonly identifiable surnames, and have been subject to stereotyping, invidious ethnic humor, and discrimination, and it concluded that Italian–Americans are a cognizable racial group within the meaning of *Batson v. Kentucky,* 476 U.S. at 96, 106 S.Ct. at 1722; and *Castaneda v. Partida,* 430 U.S. 482, 494, 97 S.Ct. 1272, 1280, 51 L.Ed.2d 498 (1977). The court also found that the government had indeed used most of its peremptory challenges to strike jurors with apparently Italian surnames.

The court concluded, however, that the government had come forward with sufficient "neutral, specific and reasonable explanations substantiating legitimate exclusions of each of the veniremembers removed," 673 F.Supp. at 106, and thus had rebutted defendants' prima facie case. The court found, for example, that the government had excused several of the prospective jurors because they or their spouses had held positions that might have led them to identify with one of the defendants; it also found that several of those excused by the government had displayed angry, arrogant, or flippant demeanors that led the government to be concerned that they might be insufficiently serious about jury duty and perhaps even disdainful of the judicial process. The court therefore found that the government's reasons for striking the challenged jurors were legitimate rather than invidious. It found the suggestion of purposeful discrimination further rebutted by the actual composition of the jury, which included at least two members of Italian descent and comprised "an excellent cross-section of the Eastern District of New York by ethnic background, race, sex, education, age, experience and geography." *Id.*

 The district court's findings as to the motivations of the prosecution in exercising its peremptory challenges must be upheld unless they are clearly erroneous, *Roman v. Abrams,* 822 F.2d at 228; *see Anderson v. City of Bessemer City, N.C.,* 470 U.S. 564, 573–74, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985), and its assessments of the credibility of the witnesses who appear before it are entitled to considerable deference. Where the court itself has conducted the voir dire and thus was able to observe as well the demeanor of the prospective jurors, we believe the court's assessment of the prosecution's stated reasons for excusing jurors is entitled to especial deference.

In the present case, the explanations offered by the government were neither trivial nor unsupported by the record. We conclude that the district court's findings as to the explanations offered by the government are not clearly erroneous, and that its conclusion that there was no violation of defendants' rights under the Equal Protection Clause or the Sixth Amendment must be upheld.

## C. *The Gratuity Charges*

Section 201 of 18 U.S.C., entitled "Bribery of public officials and witnesses," contained various provisions outlawing the giving or receipt of anything of value in exchange for, *inter alia,* a federal official's performance of official acts. The section defined "official act" to mean

any decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before

any public official, in his official capacity, or in his place of trust or profit.

18 U.S.C. § 201(a) (1982) (since amended by Pub.L. No. 99–646, § 46(a), 100 Stat. 3592, 3601 (1986)). The subsections dealing with unlawful gratuities provided as follows:

(f) Whoever, otherwise than as provided by law for the proper discharge of official duty, directly or indirectly gives, offers, or promises anything of value to any public official ... for or because of any official act performed or to be performed by such public official ...; or

(g) Whoever, being a public official ... otherwise than as provided by law for the proper discharge of official duty, directly or indirectly asks, demands, exacts, solicits, seeks, accepts, receives, or agrees to receive anything of value for himself for or because of any official act performed or to be performed by him ...

. . . .

Shall be fined not more than $10,000 or imprisoned for not more than two years, or both.

18 U.S.C. §§ 201(f) and (g) (1982).

Defendants contend that the acts performed by Biaggi on behalf of Coastal were not "official act[s]" within the meaning of § 201 because they were not legislative acts and because they were directed principally toward municipal, not federal, agencies. In addition, defendants contend that there was insufficient evidence to show that the vacations were offered or accepted "for or because of" Biaggi's acts. We reject both contentions.

### 1. Official Acts

■ Biaggi's suggestion that a congressman's only "official act[s]" within the meaning of § 201 are acts in the legislative process itself is untenable. The language of the section does not mention legislative acts, and courts have read the section and its predecessors sufficiently broadly to encompass all of the acts normally thought to constitute a congressman's legitimate use of his office.

The earliest pertinent interpretation is found in *United States v. Birdsall*, 233 U.S. 223, 231, 34 S.Ct. 512, 514, 58 L.Ed. 930 (1914), in which the Supreme Court upheld convictions in connection with bribes given to employees of the Department of the Interior to induce them to recommend lenient sentencing for certain persons convicted of selling liquor to Indians. The statutes at issue made it unlawful to give a bribe to a federal officer with the intent to influence him "to do or omit to do any act in violation of his lawful duty," and unlawful for the officer to accept money with the intent to have "his decision or action" influenced "on any question, matter, cause, or proceeding which may at any time be pending, or which may by law be brought before him in his official capacity." Criminal Code §§ 39, 117, 35 Stat. 1088, 1096, 1109 (1909). In determining whether recommendations by the federal employees were part of their official duties, the Court noted that conduct could constitute official action even though it was not prescribed by statute or written rule or regulation. The scope of official conduct may be found, in addition, in "established usage," for "[i]n numerous instances, duties not completely defined by written rules are clearly established by settled practice, and action taken in the course of their performance must be regarded as within the provisions of the above-mentioned statutes against bribery." 233 U.S. at 231, 34 S.Ct. at 514–515.

In the context of a prosecution of a former United States Senator for alleged bribery, the Supreme Court has noted that "the realities of the American political system" are that "many non-legislative activities are an established and accepted part of the role of a Member" of Congress. *United States v. Brewster*, 408 U.S. 501, 524, 92 S.Ct. 2531, 2543, 33 L.Ed.2d 507 (1972). Thus, this Court has recognized that a congressional aide's use of his congressman's official position to help private individuals constitutes an official act by the aide within the meaning of § 201(a). *United States v. Carson*, 464 F.2d 424 (2d Cir.), *cert. denied*, 409 U.S. 949, 93 S.Ct. 268, 34 L.Ed.2d 219 (1972). In *Carson*, we upheld the bribery conviction of a United States Senator's administrative assistant, noting that the defendant, "as a part of his job and under the

applicable 'procedure that goes on at Capitol Hill,' ... would exert influence on various agencies and branches of the Government...." *Id.* at 434. We noted that even if the aide's intervention in a certain criminal prosecution were a " 'personal frolic of his own,' " it would nonetheless constitute an official act, "the determinative factor [being] that the primary source of any conceivable influence ... was the official position held by [the aide], enhanced as it was by the status of his employer's membership" in the Senate Judiciary Committee. *Id.* A congressman's own invocation of his position and of congressional interest in his intercession with others on behalf of a constituent can hardly be considered less of an official act.

Consistent with the judicial recognition of the realities of the scope of a congressman's job, defendants' attorneys, in cross-examining Senator D'Amato at trial, brought out the fact that the duties of senators and representatives routinely include interceding with various agencies on behalf of their constituents. For example:

Q [by Esposito's attorney] ...

Senator D'Amato, as part of your responsibilities and endeavors as a senator, do you and your staff get involved with the problems of people in New York, business people, who are looking for your help?

A Certainly.

Q And would you say that that's done on a daily basis, isn't that correct?

A Absolutely.

As an illustration, Esposito's counsel elicited the fact that in 1982, both of New York's senators and at least four of its representatives, including Biaggi, had collaborated on an effort to have Coastal awarded a contract to repair the Navy ship IOWA.

Biaggi's counsel's questioning of the Senator proceeded along the same lines:

Q [by Biaggi's counsel] Your office is open to anyone that would either call or write with a problem, with a question, with a need or desire, is that correct?

A That is correct.

Q That's part of being a United States Senator or a Congressman?

A I think so.

With respect to the December 3, 1985 meeting among Biaggi, Senator D'Amato, and Vincent Montanti, during which the Senator attempted to call the Secretary of the Navy, Biaggi's attorney asked,

Q So that's what you and Congressman Biaggi were doing on December 3, 1985? You were stepping up to the plate and you were at bat doing your jobs, is that correct?

A Yes, that's correct.

■ Certainly the manner in which Biaggi went about seeking to help Coastal suggested that his conduct was to be considered official. For example, he wrote letters on behalf of Coastal using his congressional stationery, or using the stationery of the House Committee on Merchant Marine and Fisheries and signing as Chairman of the Subcommittee on Merchant Marine. He opened an office file on Coastal and had the matter handled by his administrative assistant, the top manager of his congressional office. He told Esposito he planned to introduce a bill in Congress that could provide work for Coastal. In one of his letters to Mayor Koch, Biaggi offered to attend meetings between the City and the Navy with respect to Coastal if the Mayor thought that might be "helpful in demonstrating Congressional interest." We know of nothing in the law that precluded the jury from considering Biaggi's intercessions as official acts, and the evidence plainly supported the inference that they were official acts.

■ We also reject Biaggi's contention that the gratuity provisions did not apply to his acts because they were directed at City officials rather than federal officials. No such limitation appears on the face of § 201, which refers to "any" action taken on a matter brought before the public official in his official capacity. The breadth of § 201 is highlighted by the narrower thrust of 18 U.S.C. § 203 (1982) (since amended by Pub.L. No. 99–646, § 47(a), 100 Stat. 3592, 3604 (1986)), a conflict-of-interest statute enacted contemporaneously with the perti-

nent version of § 201. Section 203 prohibits an official from accepting payment in relation to matters pending before specific federal forums. *See* 18 U.S.C. § 203(a); *United States v. Myers,* 692 F.2d 823, 855 (2d Cir.1982), *cert. denied,* 461 U.S. 961, 103 S.Ct. 2437, 77 L.Ed.2d 1322 (1983). We assume that Congress's failure similarly to limit § 201's definition of "official act" reflects an intention that § 201 not be restricted to acts directed at federal agencies.

Nor does the legislative history of § 201 provide a basis for reading the section more narrowly than it was drafted. The section's immediate predecessor with respect to the legislative branch, while referring specifically to matters pending in Congress, also made it unlawful for a member of Congress to receive payment "with the intent to have his action ... influenced on any question, matter [or] cause ... which by law may be brought before him in his capacity as such Member." 18 U.S.C. § 205 (1958). The legislative history of § 201 noted that the new § 201, which used substantially the same language, made "no significant changes of substance." S.Rep. No. 2213, 87th Cong., 2d Sess., *reprinted in* 1962 U.S.Code Cong. & Admin.News ("USCCAN") 3852, 3853; 1962 USCCAN at 3856 ("The term 'official act' is defined to include any decision or action taken by a public official in his capacity as such.").

In sum, we see no basis for ruling that a congressman's official acts—especially those "demonstrating Congressional interest"—may not include efforts that are directed toward local rather than federal officials. We note that both of the deputy mayors approached by Biaggi testified at trial that it was not unusual for a congressman to intercede for a constituent on city matters; Biaggi easily gained their attention precisely because he was a congressman.

Finally, the evidence revealed that Biaggi's efforts were directed toward federal officials as well as City officials. He urged Senator D'Amato to call the Secretary of the Navy, and he repeatedly called the Senator to inquire as to what progress had been made. He himself called the Commandant of the Coast Guard.

The trial court read the jury the statutory definition of "official act[s]" and properly instructed it that "[o]fficial acts are not limited to those set forth in a written job description, but may include as well those duties and activities customarily associated with a particular position." The evidence was ample to permit the jury to conclude beyond a reasonable doubt that the acts performed by Biaggi on behalf of Coastal were among those customarily associated with a congressman's job.

2. The Sufficiency of the Evidence that the Vacations Were in Return for the Official Acts

In arguing that the evidence was insufficient to show that Esposito provided Biaggi with vacations "for or because of" Biaggi's official acts on behalf of Coastal, defendants bear a heavy burden. *United States v. Losada,* 674 F.2d 167, 173 (2d Cir.), *cert. denied,* 457 U.S. 1125, 102 S.Ct. 2945, 73 L.Ed.2d 1341 (1982). In reviewing this contention, we must view the evidence in the light most favorable to the government, *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), crediting every inference that could have been drawn in the government's favor, *United States v. Bagaric,* 706 F.2d 42, 64 (2d Cir.), *cert. denied,* 464 U.S. 840, 104 S.Ct. 133, 78 L.Ed.2d 128 (1983), and we must affirm the convictions so long as, from the inferences reasonably drawn, the jury might fairly have found the requisite connection beyond a reasonable doubt, *United States v. Taylor,* 464 F.2d 240, 245 (2d Cir.1972). Defendants have not carried their burden.

 The evidence at trial, taken in the light most favorable to the government, including the nature and sequences of events, certain explicit statements, and the suggestions of cover-up, provided an ample basis for the jury rationally to infer that the vacations were given and accepted in exchange for Biaggi's efforts on behalf of Coastal. The jury could reasonably have inferred, for example, from the very substantial cost of the Florida vacations—sev-

eral thousands of dollars in each year—that the vacations were not intended simply as kindness-of-the-heart gifts from Esposito or his companies. Further, Esposito's arrangements for the Florida vacations were solicited by Biaggi; the jury was free to infer that Biaggi was not requesting gifts of thousands of dollars without offering something more than his friendship in return.

The sequences themselves lent further support to the jury's rejection of any inference that Biaggi offered nothing and Esposito expected nothing in return for the vacations. For example, after BNYDC drew a hard line with Coastal in late 1983, Biaggi was given a vacation in St. Maarten in early 1984, in the company of, *inter alios,* SVR partners whose commissions were jeopardized by Coastal's problems with BNYDC. Some weeks thereafter, Biaggi called Deputy Mayor Lipper, and later followed up with a letter to Mayor Koch, to seek relief for Coastal. In mid–1984, Barlow began urging Biaggi to take her to the Fort Lauderdale spa for the Christmas holidays. During the latter half of 1984, Biaggi, *inter alia,* wrote another letter to Mayor Koch and offered to meet with Coastal and the Navy to show congressional concern. By Christmas 1984, Esposito had made the necessary arrangements for Biaggi and Barlow to use the spa. Throughout 1985, Barlow pressed Biaggi for a return to the spa the following Christmas season. From mid–1985 to the end of the year, Biaggi "bird-dogg[ed]" Coastal's problems, repeatedly calling Deputy Mayor Townsend with regard to BNYDC charges, securing payment by the Navy of some of Coastal's closely scrutinized claims, and calling on Senator D'Amato to seek help from the Secretary of the Navy. In the fall of 1985, Biaggi called Esposito and told him that Biaggi and Barlow wanted to return to the spa. Esposito said he would make the arrangements and immediately asked what progress Biaggi was making for Coastal; the tape of this conversation, quoted in part in Part I.A. above, suggests that both Biaggi and Esposito viewed the two matters as related. The jury was surely free to infer that defendants' implicit

understanding was that the thousands of dollars committed by Esposito for Biaggi's vacations were a quid pro quo for Biaggi's Coastal efforts. Indeed, when Esposito told his SVR partner Martuscello that he had provided the two Florida vacations for Biaggi, Esposito himself characterized it as "good money invested."

Finally, support for the inference that the vacations were provided in exchange for Biaggi's efforts on behalf of Coastal is found in Biaggi's telephone call to Esposito, suggesting various fabrications, immediately after Biaggi had been questioned by the FBI. As set forth in greater detail in Part II.E. below, he coached Esposito, *inter alia,* to characterize the vacations as manifestations of simple concern for Biaggi's health; to lie about the timing of Esposito's request that Biaggi intercede for Coastal, placing that request after the last vacation; and to conceal the St. Maarten vacation entirely. In short, Biaggi told Esposito, "We say you haven't done anything for me and I haven't done anything for you."

We conclude that the evidence was ample to permit a rational jury to find beyond a reasonable doubt that Esposito provided the vacations "for or because of" Biaggi's official acts on behalf of Coastal.

### D. *The Travel Act*

Count 6 of the indictment charged Biaggi with violation of the Travel Act, 18 U.S.C. § 1952, and charged Esposito with aiding and abetting that violation, on the ground that Biaggi traveled in interstate commerce, or used facilities in interstate commerce, to carry on an unlawful activity, to wit, "bribery in violation of [§ ] 201." Defendants contend that their convictions on count 6 should be vacated because (1) they were acquitted of giving or receiving unlawful bribes in violation of 18 U.S.C. §§ 201(b) and (c), and convictions of giving and receiving unlawful gratuities are insufficient to support a Travel Act conviction, and (2) since Biaggi's air fare to Florida was paid by the House Committee on Aging in connection with potential legislation, Biaggi's travel was protected by the

Speech or Debate Clause of the Constitution. We are unpersuaded.

### 1. Unlawful Gratuities as a Travel Act Predicate

 Section 1952 of 18 U.S.C. makes it unlawful to "travel[ ] in interstate or foreign commerce or use[ ] any facility in interstate or foreign commerce ... with intent to ... pron ote, manage, establish, carry on, or facilitate ... carrying on, of any unlawful activity." 18 U.S.C. § 1952(a)(3). As used in § 1952, "unlawful activity" is defined, in pertinent part, to mean "bribery ... in violation of the laws of the State in which committed or of the United States." *Id.* § 1952(b). In determining how to instruct the jury as to permissible predicates for a Travel Act conviction, the trial court noted, *inter alia,* that count 6 of the indictment referred simply to § "201" as the Travel Act predicate, without distinguishing between the subsections that referred to "corrupt[ ]" intent to influence official action (§§ 201(b) and (c)) and the subsections that prohibited gratuities without requiring proof of "corrupt[ion]" and "intent to influence" (§§ 201(f) and (g)). It also noted that § 201 as a whole is entitled "Bribery of public officials and witnesses." Accordingly, the court instructed the jury, over defendants' objections, that it could base Travel Act convictions on violations of the gratuity provisions, §§ 201(f) and (g), even if it found defendants not guilty of violating §§ 201(b) and (c). Defendants contend that this instruction was erroneous and that, since the jury acquitted them of the charges under subsections (b) and (c), the court should have granted their posttrial motion to set aside the Travel Act convictions. We disagree.

In a well-reasoned posttrial opinion reported at 674 F.Supp. 86 (1987), the district court thoroughly explored the question whether Congress intended a violation of the gratuity provisions of § 201 to suffice as a predicate for a Travel Act conviction, and we reject defendants' statutory construction challenge to the count 6 conviction substantially for the reasons set forth in that opinion.

As the district court noted, the crime of bribery eludes precise definition. While the term "bribe" traditionally carried a connotation of corrupt intent to influence official action, the trend among scholars, commentators, and legislators has been away from linking impermissible bribery ineluctably to corruption, *see Perrin v. United States,* 444 U.S. 37, 100 S.Ct. 311, 62 L.Ed. 2d 199 (1979), particularly where the thing of value is given to a public official. We think it undoubtedly true that a corrupt payment intended to influence an official act is more serious than a payment merely "for or because of" an official act without proof of corruption, and the penalties provided by Congress reflect such an assessment. *See, e.g.,* 18 U.S.C. § 201 (1982) (possible penalties for violation of subsections (b) and (c), requiring proof of corrupt intent, included $20,000 fine and 15 years' imprisonment, whereas penalties for violations of subsections (f) and (g) were fines of "not more than $10,000 or imprisonment for not more than two years, or both"). Nonetheless, "[t]here is no reason to infer that the policy and purpose behind the 'corrupt intent to influence' offenses [are] substantially different from [those] underlying the 'for or because of' offenses. All sections of the bribery statute are aimed at preventing the evil of allowing citizens with money to buy better public service than those without money.... '[e]ven if corruption is not intended by either the donor or the donee, there is still a tendency in such a situation to provide conscious or unconscious preferential treatment of the donor by the donee, or the inefficient management of public affairs.' " 674 F.Supp. at 89 (quoting *United States v. Evans,* 572 F.2d 455, 480 (5th Cir.), *cert. denied,* 439 U.S. 870, 99 S.Ct. 200, 58 L.Ed.2d 182 (1978)).

This substantial identity of the purposes behind the two levels of offense was evident prior to the enactment of § 201, for certain of the bribery statutes that were predecessors of § 201 conjoined the prohibitions against offering a thing of value "because of" an official act and against offering it "with intent to influence" that act. Thus, in the 1958 Criminal Code,

§ 206 made it unlawful to offer a thing of value "because of or with intent to influence" a judge's decision, 18 U.S.C. § 206 (1958); and § 207 made it unlawful for the judge to receive a thing of value "because of or with intent to be influenced," 18 U.S.C. § 207 (1958). Accordingly, a defendant prosecuted under one of those sections could have been convicted of bribery without proof of "corrupt" intent. Although § 201, enacted in 1962, grouped the "corrupt intent" offenses separately from the "because of" offenses and provided different penalties for the two groups, the legislative history indicates that Congress's purpose was simply to "consolidate ... the various existing bribery statutes" governing various officials "into a single section." 108 Cong.Rec. 21,981 (1962) (statement of Senator Kefauver). As discussed in Part II.C.1. above, the legislative history of § 201 stated that Congress intended "no significant changes of substance." S.Rep. No. 2213, 87th Cong., 2d Sess., *reprinted in* 1962 USCCAN at 3853; *see also* 108 Cong.Rec. 21,981 (1962) ("consolidation makes no significant changes of substance and would not narrow the broad sweep of the current bribery laws") (statement of Senator Kefauver).

In sum, we agree with the district court that the policy, evolution, and legislative history of § 201 indicate that Congress intended a violation of any portion of that section, which it entitled "Bribery [of various persons]" and viewed as a compilation of bribery offenses, to constitute a "bribery" offense within the meaning of § 1952.

#### 2. The Speech or Debate Clause

■ Biaggi also mounts a constitutional challenge to his Travel Act conviction, arguing principally that because he conducted legislative activity in Florida during the 1984 and 1985 Christmas holiday trips and his travel was necessary to carry out that activity, the Speech or Debate Clause immunized him from prosecution under 18 U.S.C. § 1952. We disagree. Travel itself normally lacks the necessary legislative character to trigger speech-or-debate protection. Further, proof of Biaggi's use of interstate telephone facilities sufficed to support the convictions under § 1952 regardless of any travel.

The Speech or Debate Clause provides that "for any Speech or Debate in either House, [Senators or Representatives] shall not be questioned in any other Place." U.S. Const. art. 1, § 6, cl.1. As the Supreme Court has noted, "[t]he heart of the Clause is speech or debate in either House. Insofar as the Clause is construed to reach other matters, they must be an integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings...." *Gravel v. United States*, 408 U.S. 606, 625, 92 S.Ct. 2614, 2627, 33 L.Ed.2d 583 (1972). Thus, the clause does not protect "all conduct *relating* to the legislative process." *United States v. Brewster*, 408 U.S. at 515, 92 S.Ct. at 2539 (emphasis in original). In *Brewster*, the Court ruled that the clause did not bar the prosecution of a Senator for accepting bribes in exchange for promises to vote in a certain way, because the acceptance of money is not a legislative act. In *Gravel*, the Court found the clause applicable to the actions of a Senator's administrative assistant to prepare the Senator for a subcommittee meeting in Washington, but inapplicable to the Senator's subsequent contacts with a publisher to publish papers that the Senator had read at the meeting. Although publication might have some relationship to the legislative process, it was not integral to the process.

■ *Gravel* and other cases make it clear that speech-or-debate protection extends beyond congressmen's statements on the floor of the Congress. In *Eastland v. United States Servicemen's Fund*, 421 U.S. 491, 95 S.Ct. 1813, 44 L.Ed.2d 324 (1975), the Court held that the issuance of a subpoena by a Senate subcommittee pursuant to an authorized investigation fell within *Gravel*'s definition of protected legislative activity. The *Eastland* Court noted that "the power to investigate is inherent in the power to make laws because '[a] legislative body cannot legislate wisely or effectively in the absence of information respecting the conditions which the legislation is intended to affect or change.'" *Id.*

at 504, 95 S.Ct. at 1822 (quoting *McGrain v. Daugherty*, 273 U.S. 135, 175, 47 S.Ct. 319, 329, 71 L.Ed. 580 (1927)). *See also McSurely v. McClellan*, 553 F.2d 1277, 1286 (D.C.Cir.1975) (en banc) ("information gathering, whether by issuance of subpoenas or field work by a Senator or his staff, is essential to informed deliberation over proposed legislation" and hence is protected legislative activity), *cert. dismissed*, 438 U.S. 189, 98 S.Ct. 3116, 57 L.Ed.2d 704 (1978).

 Under these principles, legislative factfinding activity conducted by Biaggi during his Florida trips was protected. We reject, however, Biaggi's contention that his speech-or-debate immunity was invaded by the very fact that his legislative activities in Florida were brought to the jury's attention. While it is generally true that the Speech or Debate Clause forbids not only inquiry into acts that are manifestly legislative but also inquiry into acts that are purportedly legislative, "even to determine if they are legislative in fact," *United States v. Dowdy*, 479 F.2d 213, 226 (4th Cir.), *cert. denied*, 414 U.S. 823, 94 S.Ct. 124, 38 L.Ed.2d 56 (1973), the trial record does not indicate that an impermissible inquiry was conducted. The government called Robert Blancato, Biaggi's administrative assistant, as a witness, and asked him whether the House Committee on Aging had paid Biaggi's air fare for the two trips to Florida. As the questioning with regard to these two payments progressed, Biaggi's counsel objected, saying, "We have the speech and [debate] issue," an objection that was fairly overruled in light of the charge that Biaggi had conspired to defraud the United States, *see, e.g., United States v. Bramblett*, 348 U.S. 503, 75 S.Ct. 504, 99 L.Ed. 504 (1955) (reinstating conviction of congressman for presentation of false payroll claim, *cited in United States v. Brewster*, 408 U.S. at 522 n. 16, 92 S.Ct. at 2542 n. 16, a speech-or-debate case); *United States v. Myers*, 692 F.2d at 849 (dictum) (prosecution for false travel voucher not protected by Speech or Debate Clause, citing *United States ex rel. Hollander v. Clay*, 420 F.Supp. 853 (D.D.C. 1976)). Immediately thereafter, Blancato,

without a further question from the government, volunteered that the Florida trips were "[i]n 1984 as part of a fact finding visit to inspect and visit the agency on Aging in Broward County and 1985 to visit the Health Maintenance Organization in preparation for the congressional hearings to be held in New York City...." Eventually, Biaggi's attorney unsuccessfully requested a ruling from the court that the government's payment of Biaggi's air fare was not relevant. That request was accompanied by the statement that "the government has put into evidence and I did not object, there are times I don't object for strategic reasons, the fact that Congressman Biaggi's flight fare was paid for [sic] the Committee for the Aging." The "strategic reasons" for the lack of any further objection were obvious: the fact that there may have been a legislative factfinding purpose for Biaggi's trips to Florida provided defendants with a foundation for arguing to the jury that those trips were not in furtherance of the receipt of unlawful gratuities.

Thus, the record reveals that the government initially sought to focus on nonlegislative reasons for Biaggi's trips and did not initiate the exploration of his legislative factfinding activity, that the factfinding activity was first mentioned by Biaggi's aide in a volunteered statement when no question from the government was pending, and that after that statement there was no further speech-or-debate objection by Biaggi "for strategic reasons." We conclude that the subsequent questioning of Blancato with regard to that activity and the government's efforts to minimize the role of that activity as an impetus for the Florida trips provide no basis for reversal. We do not, of course, construe Biaggi's strategy with regard to use of the factfinding activity as in any way waiving his argument that the travel itself was part of the protected activity. *See United States v. Helstoski*, 442 U.S. 477, 491, 99 S.Ct. 2432, 2440, 61 L.Ed.2d 12 (1979) (no waiver of speech-or-debate immunity without "explicit and unequivocal renunciation of the protection").

We are unpersuaded, however, that the travel itself should be considered legislative activity. Travel may well be related to the legislative process if its purpose is, for example, to attend a debate or to conduct on-site collection of information for consideration of contemplated legislation. Nonetheless, unless the focus of the legislation itself is transportation, the mere transport of oneself from one place to another is simply not "an integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings." *Gravel v. United States,* 408 U.S. at 625, 92 S.Ct. at 2627. We conclude that the Speech or Debate Clause does not immunize a congressman from prosecution for interstate travel in furtherance of receipt of an unlawful gratuity, any more than it would immunize him from a charge of theft of services if he traveled as a stowaway.

The fact that one of the purposes of the travel may have been the conduct of legislative activity does not preclude a conviction under § 1952. We have held that "[w]here travel is motivated by two or more purposes, some of which lie outside the ambit of the Travel Act, a conviction is still possible if the requisite illegal purpose is also present." *United States v. Walsh,* 700 F.2d 846, 854 (2d Cir.), *cert. denied,* 464 U.S. 825, 104 S.Ct. 96, 78 L.Ed.2d 102 (1983); *see United States v. Peskin,* 527 F.2d 71, 75 (7th Cir.1975) ("section 1952 does not require that defendant's travel be solely in pursuit of criminal activity"), *cert. denied,* 429 U.S. 818, 97 S.Ct. 63, 50 L.Ed. 2d 79 (1976).

■ Finally, even if there had been no travel whatever by Biaggi, the government's allegations and proof were sufficient to support the convictions under § 1952. That section prohibits not just "travel[ ]" to carry out unlawful activity; it also prohibits use of any interstate facility for such purposes. Count 6 of the indictment alleged that Biaggi used such facilities to carry on his activities in violation of § 201, and the proof included evidence that Biaggi called New York from Washington to ask Esposito to arrange for his stay at the spa. The jury was properly instructed that it could find defendants guilty under § 1952 if it found that either the travel or the use of the telephones was in furtherance of acts in violation of § 201. The evidence was sufficient to support either.

### E. *Obstruction of Justice*

■ Section 1503 of 18 U.S.C. makes it unlawful to "corruptly ... influence[ ], obstruct[ ], or impede[ ], or endeavor[ ] to influence, obstruct, or impede, the due administration of justice." To obtain a conviction under this section, the government is required to prove that there was a pending federal judicial proceeding, that the defendant knew of the proceeding, and that he intentionally interfered with or attempted to interfere with it. *See United States v. Capo,* 791 F.2d 1054, 1070 (2d Cir.1986), *vacated in part on other grounds,* 817 F.2d 947 (2d Cir.1987) (en banc). Biaggi's conviction under this section is based on the government's contention that Biaggi impeded and attempted to impede the grand jury's investigation by urging Esposito on June 2, 1986, to withhold information and to give false, evasive, and misleading information. Biaggi contends that the evidence was insufficient to show that when he had the pertinent conversation with Esposito, (a) a grand jury proceeding was pending, and (b) he knew such a proceeding was pending. We disagree.

■ The parties stipulated at trial that on February 13, 1986, a federal grand jury in the Eastern District "commenced an investigation into the matter set forth in the indictment for which the defendants are currently on trial." There was testimony at trial that in connection with this investigation, FBI agents met on or about June 1, 1986, to discuss conducting 50–60 interviews and serving some 70 grand jury subpoenas. On the morning of June 2, FBI agents interviewed Biaggi and shortly thereafter served him with a subpoena. While Biaggi was being interviewed, other agents were interviewing Barlow; the testimony indicated that Barlow was served with a grand jury subpoena during her interview. Thus, the record amply permit-

ted the inference that when Biaggi called Esposito after Biaggi's interview, a grand jury proceeding was pending.

Though there was no testimony as to whether the interviewing agents had informed Biaggi of the grand jury, the record suggests that he knew of it. Prior to Biaggi's call to Esposito, Barlow, who was served with a grand jury subpoena during her interview, spoke by telephone with Biaggi. When Biaggi thereafter called Esposito (and prompted Esposito, *inter alia*, to agree that he and Biaggi had been "very dear friends" for quite a long time, and that Esposito was concerned about Biaggi's health and had invited him to the spa for that reason), he urged Esposito to pay attention because "[t]his is serious." Esposito said, "It sounds like a fuckin' grand jury." Biaggi replied, "That's, that's what I'm talking about." Crediting all inferences that could be drawn in the government's favor, we conclude that the evidence was sufficient to permit the jury to infer that, when he spoke with Esposito, Biaggi knew the grand jury proceeding was pending.

There can be no doubt that Biaggi sought to have Esposito impede the investigation. For example, having coached Esposito to characterize the Florida spa trips as emanating simply from an old and dear friend's concern for Biaggi's health (Biaggi: "You knew I had, you knew I had some trouble with my heart?" Esposito: "When?"), Biaggi urged concealment of the St. Maarten trip:

MB [Biaggi]: ... Uh, don't mention St. Maartens [*sic*] ... cause I ...

ME [Esposito]: Oh, I thought that you mentioned it.

MB: No, they just, I didn't mention it.

ME: Okay.

MB: Uh, we just mention the two times at the spa.

ME: No problem.

Returning to the matter of the spa vacations, defendants agreed:

ME: This is not a gift. It's uh, it's a, uh, manifestation of my love for you.

MB: You didn't give it to me because I'm a member, member of Congress.

ME: Nah. Never, no bull. No way.

MB: Have you ever done, have you ever done anything for me?

ME: Have I ever done anything for you?

MB: I, I told them, "No." We say you haven't done anything for me and I haven't done anything for you....

ME: That's right.

MB: And that's the way we're gonna keep it.

We see no basis for overturning Biaggi's conviction for obstruction of justice.

## F. *Evidentiary Contentions*

Finally, defendants make two principal claims of error with respect to the court's evidentiary rulings, (1) that the court should have excluded evidence of the St. Maarten trip, and (2) that it should have excluded an ambiguous tape of a conversation between Esposito and a bookkeeper at Beaumont. We reject both contentions.

In arguing that the evidence of Esposito's providing Biaggi with the March 1984 trip to St. Maarten should have been excluded, defendants contend that the court admitted this evidence as "other acts" under Fed.R.Evid 404(b) without a proper foundation for such a ruling. We disagree with both the characterization of the basis of admission and the contention that admission was error.

The basis for defendants' assertion that the court acted under Rule 404(b) apparently has its origin in a confusion displayed by defendants in the trial court. They urged exclusion of the St. Maarten evidence on the theory that the trip predated the period of the conspiracy and thus could not have been in furtherance of it, and they argued that it was incumbent on the court to make a preliminary determination as to the time period covered by the conspiracy. The court noted that such a preliminary determination would be necessary with regard to the admissibility of alleged coconspirator statements challenged on hearsay grounds, *see United States v. Geaney*, 417 F.2d 1116 (2d Cir.1969), *cert. denied*, 397 U.S. 1028, 90 S.Ct. 1276, 25 L.Ed.2d 539 (1970); Fed. R.Evid. 801(d)(2)(E), but pointed out that the evidence relating to the St. Maarten

trip was not subject to a hearsay objection because it did not consist of statements. Thus, the court's response to defendants' position was, "Acts, acts. That's not hearsay. The man went to St. Maarten. His payments were made. Those are acts. That's not hearsay at all." Defendants have transmuted this explanation of why hearsay principles were not at issue into an assumed ruling that the St. Maarten trip was an "other act" governed by Rule 404(b). There is no basis for this assumption.

In fact, the St. Maarten trip was cited in the indictment as an overt act in furtherance of the conspiracy, and the government was entitled to prove that trip as part of the conduct—conspiracy—for which defendants were indicted. Thus, far from being an "other" act, it is part of the very act charged. See, e.g., United States v. Angelilli, 660 F.2d 23, 39 (2d Cir.1981), cert. denied, 455 U.S. 910, 102 S.Ct. 1258, 71 L.Ed.2d 449 (1982); United States v. Papadakis, 510 F.2d 287, 294–95 (2d Cir.), cert. denied, 421 U.S. 950, 95 S.Ct. 1682, 44 L.Ed.2d 104 (1975). Defendants' contention that the provision of this trip had nothing to do with the alleged conspiracy on behalf of Coastal was an argument to be made to the jury rather than a ground for exclusion of the evidence by the court. Further, evidence as to the St. Maarten trip was admissible because the government charged that Biaggi's urging Esposito to conceal that trip was part of Biaggi's effort to obstruct justice.

Defendants made no request that the court instruct the jury that the St. Maarten trip could be considered only with respect to the conspiracy and obstruction of justice counts and not as evidence supporting the substantive counts charging bribery and unlawful gratuities, and we need not reach the question of whether the court should have done so if requested. No limitation having been requested or given, the jury was entitled to consider the evidence in connection with all of the counts in the indictment.

Defendants' other principal evidentiary challenge is to the admission of a taped conversation between Esposito and a Beaumont officer on June 2, 1986, after Biaggi had been interviewed by the FBI, offered by the government to show that Esposito asked, "How much we got in" Biaggi, and received the answer "10–2." These statements were admitted against Esposito as admissions, see Fed.R.Evid. 801(d)(2)(A) and (B), and against Biaggi as statements of Esposito against Esposito's penal interest, see Fed.R.Evid. 804(b)(3). Defendants contend that the conversation was not as the government transcribed it and that, accurately interpreted, the conversation was neither against Esposito's interest nor relevant to the issues of the present case. Given the course of the proceedings below, we find no basis for reversal.

In making their initial objections to the introduction of the conversation, defendants advanced a different objection, one that did not dispute what was said so much as it disputed the doctrinal characterization of what the government said was said. Thus, they contended that the alleged bribery-gratuity conspiracy between Biaggi and Esposito had ended with the FBI interviews on June 2, and that subsequent conversations could not be considered to be in furtherance of the conspiracy and thus admissible under Fed.R.Evid. 801(d)(2)(E). When the court ruled that the conversation was admitted not on the infurtherance ground but rather as a declaration against interest, defendants argued that it should be excluded because it was a "completely exculpatory" statement, a characterization rejected by the court.

After the conversation was admitted in evidence, defendants challenged the accuracy of the government's interpretation of the tape and presented expert testimony to the effect that other sounds on the tape indicated that the "How much we got in" question referred to something other than Biaggi and that the mention of Biaggi was contained in a new thought. This interpretation is now offered in support of defendants' contention that the statement was not in fact against Esposito's interest. The defense expert's view, however, does not

appear to have been before the court when defendants' initial objections were made, and on the basis of the record before it, the court was entitled to admit the conversation. Had the defendants come forward with their dispute of the content of the conversation before the tape was admitted, the court might well have excluded the tape on the ground that its probative value was outweighed by the prejudice to defendants if it were admitted. *See* Fed.R.Evid. 403. Indeed, in summation, the government conceded that defendants' expert "might very well have been right" in his interpretation of the conversation. Given defendants' failure to provide the trial court with their present objection prior to admission of the tape, however, and given the lack of merit of the objections that were made, the court did not err in admitting the tape.

## CONCLUSION

We have considered all of defendants' arguments on these appeals and have found them to be without merit. The judgments of conviction are in all respects affirmed.